**Billy WOODARD, Plaintiff,**

v.

**Willis SARGENT, Defendant.**

No. PB–C–81–433.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Aug. 5, 1983.

---

Thomas M. Carpenter, Little Rock, Ark., Michael Chertoff, Latham, Watkins & Hills, Washington, D.C., for plaintiff.

William C. Mann, III, Asst. Atty. Gen., Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

EISELE, Chief Judge.

Currently before the Court is Mr. Billy Woodard's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. Mr. Woodard was convicted of capital felony murder in Poinsett County, Arkansas Circuit Court on March 4, 1976 and sentenced to death. His conviction was affirmed by the Arkansas Supreme Court on June 27, 1977. *Woodard v. State*, 261 Ark. 895, 553 S.W.2d 259 (1981). Permission to proceed under Rule 37 of the Arkansas Rules of Criminal Procedure was denied on June 29, 1981. *Woodard v. State*, 273 Ark. 235, 617 S.W.2d 861 (1981). His petition for a Writ of Certiorari in the United States Supreme Court was denied on November 16, 1981. The current petition for a Writ of Habeas Corpus was filed on December 23, 1981, and a stay of execution was granted on December 29, 1981. An evidentiary hearing was held on the petition on January 13, 14, and 24, 1983.

Petitioner raises a number of arguments in support of his contention that his conviction and sentence were unconstitutionally obtained. Each argument will be discussed in turn.

## I. PETITIONER'S FOURTH AMENDMENT RIGHTS WERE VIOLATED BY THE INTRODUCTION OF CONFESSIONS OBTAINED AS THE RESULT OF AN ILLEGAL ARREST

Mr. Woodard was convicted of the murder of Mr. Columbus Baker. The evidence against him consisted principally of three confessions given on October 10 and 11, 1975. The petitioner argues that he was arrested without probable cause on October 10 in violation of the Fourth Amendment, and that his confessions were the fruit of this illegal arrest. This argument is based on *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). The Court has concluded that this issue is not properly cognizable on habeas review.

In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) the Court held that prisoners in state custody may not challenge their convictions on Fourth Amendment grounds through a collateral attack under 28 U.S.C. § 2254. The Court reasoned that the purpose behind the exclusionary rule, the deterrence of police misconduct, was not served by addressing the merits of the prisoner's Fourth Amendment challenge at the level of federal habeas corpus review. Such a claim was not, therefore, properly reviewable, absent a showing that the petitioner was denied a full and fair opportunity to litigate the claim in the state courts.

The petitioner argues that the *Stone* rule applies only to the exclusion of physical evidence, and not to the exclusion of custodial statements allegedly obtained in violation of the Fourth Amendment. While that issue was unresolved by the United States Supreme Court at the time the parties briefed it, it has since been addressed by the high court. In *Cardwell v. Taylor*, —— U.S. ——, 103 S.Ct. 2015, 76 L.Ed.2d 333 (1983) the Court concluded that a claim based on *Dunaway v. New York* was subject to the rule in *Stone*. The Court specifically held that custodial statements which were allegedly obtained as the result of an arrest without probable cause could not be challenged on Fourth Amendment grounds in a federal habeas corpus proceeding.

The petitioner also argues that the preclusion of *Stone* should not apply in capital cases. There is, however, no precedent for the notion that the application of *Stone* is predicated on the severity of the sentence. The *Stone* rationale, that the exclusionary rule has little deterrent value at the stage of habeas corpus collateral review, certainly applies in capital cases. The Court notes parenthetically that *Cardwell* involved a sentence of 28 separate life sentences.

The Court recognizes that capital cases demand thorough and careful review. Nevertheless, the principles of law which determine whether or not a particular conviction was arrived at by constitutional means, do not change because the case in-

volves the death penalty. The Supreme Court has determined that Fourth Amendment issues, particularly a claim predicated on *Dunaway v. New York,* are not cognizable on federal habeas corpus review. No exception should be made for those cases in which the severity of the crime has warranted the imposition of the ultimate penalty.

The petitioner also argues that he was denied the opportunity for a full and fair litigation of the Fourth Amendment claim within the meaning of *Stone v. Powell.* Petitioner's trial counsel filed a motion to suppress the confessions as involuntary under the Fifth Amendment. He did not raise a Fourth Amendment challenge to the confessions, nor was the Fourth Amendment issue raised on appeal. The issue was first raised in Mr. Woodard's Rule 37 Petition in the Arkansas Supreme Court wherein he was represented by his present attorneys. The Court dealt with the issue as follows:

> Under the circumstances it seems that this argument is not timely. In any event, the testimony of the officers was that the petitioner voluntarily traveled to the scene of the crime with the deputy and that he was not being held in custody until after he made statements which gave rise to probable cause.

617 S.W.2d at 862.

■ Petitioner maintains that the failure of his trial counsel to raise the issue amounted to ineffective assistance of counsel. He argues that his attorney's alleged incompetence denied him the opportunity for full and fair litigation of the claim. The Supreme Court has not yet specified what is meant by a "full and fair opportunity" to litigate a Fourth Amendment claim. This Court concludes that the failure of trial counsel to raise the claim is not a denial of the *opportunity* for such litigation. *Stone* was bottomed on the premise that the exclusion of evidence on collateral review would have little deterrent effect on police misconduct. This rationale is applicable so long as the petitioner *could* have raised the Fourth Amendment issue. Only

in those cases where the state court refuses to entertain the claim is the state prisoner entitled to raise a Fourth Amendment challenge.

In *Lenza v. Wyrick,* 665 F.2d 804 (8th Cir.1981) the Court of Appeals applied the bar of *Stone* where the petitioner had raised the Fourth Amendment issue at trial. The state appellate court refused to rule on the merits of the issue because of a breach of a procedural briefing rule. The Court concluded:

> It is the existence of state processes allowing an opportunity for full and fair litigation of fourth amendment claims, rather than a defendant's use of those processes, that bars federal habeas corpus consideration of claims under *Stone.* "[I]f state procedures afford the defendant in a criminal case the opportunity to [fully and fairly] litigate whether evidence obtained in violation of the fourth amendment should be excluded ... then *Stone v. Powell* precludes federal habeas corpus consideration of those issues whether or not the defendant avails himself of that opportunity." *Carver v. Alabama,* 577 F.2d 1188 (5th Cir.1978). The *Stone* bar applies despite a state court's error in deciding the merits of a defendant's fourth amendment claim. Moreover, the *Stone* bar applies with equal force to procedural mistakes that thwart the presentation of fourth amendment claims ... *Johnson v. Meacham,* 570 F.2d 918, 920 (10th Cir.1978).

*Id.* at 808 (other citations omitted).

*Lenza* establishes that the petitioner's own failure to raise a Fourth Amendment claim does not enable him to argue that he was denied the opportunity to litigate that claim. To hold otherwise would be the clearest example of bootstrapping. The Court is not impressed with petitioner's reference to the Eighth Circuit's citation of the Tenth Circuit's decision in *Johnson v. Meachum, supra.* There the court applied the *Stone v. Powell* preclusion where the petitioner had failed to raise the issue at trial. The state appellate court did not consider the merits of the issue because no

objection had been made at trial. The Tenth Circuit concluded: °

> Therefore we hold that where Johnson presented his Fourth Amendment claim to the Wyoming Supreme Court, where the Wyoming Supreme Court applied an adequate procedural ground in refusing to reach the merits of that claim, *and where Johnson's claim of ineffective assistance of counsel is not related to this issue,* habeas review of the Fourth Amendment claim is barred.

570 F.2d at 920 (Emphasis supplied).

The Tenth Circuit was not, of course, ruling that ineffective assistance of counsel amounts to the denial of an opportunity to litigate the Fourth Amendment claim. The language emphasized above merely points out the narrow scope of the decision. It is evident from the context of the quotation in *Lenza* above that the Eighth Circuit did not cite *Johnson* for the narrow dictum to which the petitioner refers.

Moreover, and most important in this Court's view, the claim of ineffective assistance of counsel can be addressed in the context of a Sixth Amendment challenge to the conviction. *See,* Section II *infra.* The fact that the particular ineffective assistance of counsel claim arises in the context of a Fourth Amendment issue does not transform that argument into one which escapes the rule of *Stone v. Powell.* The exclusionary rule does not apply in federal habeas corpus proceedings. The notion that the failure to move for the exclusion of evidence was predicated on trial counsel's incompetence must be analyzed by Sixth Amendment standards which govern the duties of effective representation.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL—FAILURE TO ASSERT THE FOURTH AMENDMENT CLAIM

■ To establish a claim of ineffective assistance of counsel, Mr. Woodard must prove (1) that his attorney failed to exercise the skills and diligence of a reasonably competent attorney, and (2) that he was materially prejudiced as a result. *Morrow v. Parratt,* 574 F.2d 411, 412–3 (8th Cir.1978). Counsel is presumed to be competent, even if hindsight reveals a tactical mistake. *Reynolds v. Mabry,* 574 F.2d 978, 979 (8th Cir.1978).

■ In applying these legal principles, the Court must analyze the facts and circumstances which were known to the police at the time that they arrested Mr. Woodard. The Court must then determine on the basis of all of those facts whether (1) a reasonably competent attorney would have moved to suppress the confessions of the petitioner on Fourth Amendment grounds, and (2) whether such a motion might have been successful.

The victim, Mr. Columbus Baker, a 65 year old white male, lived south of Jonesboro on State Highway 1 in Craighead County. On the evening of September 3, 1975 he was reported missing by his wife. An investigation was begun by the Craighead County Sheriff's office. The initial missing person investigation revealed that Mrs. Baker had left her husband at their home at 6:15 a.m. on Wednesday, September 3. She informed the police that her husband had $180.00 in cash on him at that time, including a $100.00 bill. Someone from Bay, Arkansas was to have come by that morning to perform a tune up on his truck, according to Mrs. Baker. Mr. Baker had informed his wife that he planned to wait at the house to receive his social security check which was to arrive in that day's mail sometime after 12:00 noon. The Craighead County authorities talked to two of the Baker's neighbors. Mrs. Ela Turman informed them that she was outside mowing her lawn on the morning of September 3. She noticed a young white male talking with Mr. Baker in his yard. A Volkswagen with floral designs on the back was parked in the Baker's driveway. Mr. Baker's truck was also parked there. She saw Mr. Baker's truck leave and head north on Highway 1. It was gone for approximately 5 minutes. She then went into her house, and saw no further comings or goings. Mrs. Ona Downs lived north of the Baker residence. She stated that although she wasn't sure, she thought she saw Mr. Baker drive past in his truck heading north at approxi-

mately 10:00 or 10:30 a.m. She said that he did not honk or wave at her which was unusual. She could not be certain whether anyone was with Mr. Baker or not. Mr. Gary Horn, the mail carrier for the Baker residence, informed the Craighead County Sheriff's department that he made his usual run and was by the Baker residence at about 1:30 p.m. Mr. Baker's truck was parked in the drive. He did not see Mr. Baker or anyone else at the house. He stated that this was unusual because Mr. Baker always met him to receive his social security check.

The description of the individual and the car by Mrs. Turman led the authorities to Billy Woodard. He was interviewed initially on September 5. He informed the Sheriff's department that he had been at Mr. Baker's residence on September 3 to work on Mr. Baker's truck. He claimed to have first eaten a piece of watermelon with Baker, and then worked on his truck. He said that he last saw him standing under his carport talking to a young man standing next to a blue or green Ford with a black vinyl top. Woodard could not be any more specific about the car or the individual. A Craighead County deputy, Bill Findley, again questioned Woodard on September 6 at his parent's home in Bay. He questioned the petitioner for about one hour. Deputy Findley came back about a half hour later and asked him additional questions about the blue or green Ford he reported seeing at the Baker residence.

On the evening of September 6, Mr. Baker's body was discovered by coon hunters in a remote wooded area in Poinsett County south of Payneway. The wooded area was adjacent to a soybean field and was accessible by a dirt road over a floodway levee. The road was a dead end after crossing the levee, and was not commonly travelled. The area was frequented by hunters, fishermen, and farmers who farmed land in the area accessed by the levee road.

The body was lying face up approximately 90 feet south of the road in a partially wooded and weedy area. The body was badly decomposed and appeared to have been shot with several shotgun blasts. It was apparent that at least one such shot had been to upper body, and one to the head. Mr. Baker was shoeless with clean white socks. A straw hat later identified by Mrs. Baker as belonging to the victim was found near the body. The victim's wallet was missing. A pair of prescription eyeglasses, also later identified as Mr. Baker's were found (on September 8) approximately 64 feet from where the body was located in the adjacent bean field. A "plastic power piston", or shotgun wadding, was found under the right shoulder of the victim's body. A plastic shotgun shell was found 90 feet south of the body in the farm road.

The discovery of the body triggered an investigation by three separate law enforcement jurisdictions—the Poinsett County Sheriff's Office, the Craighead County Sheriff's Office and the Arkansas State Police. While all three agencies participated, and all three agencies could pursue the investigation at their own initiative, the general coordinator or leader of the investigation was Trooper Fred Odom (now Lt. Odom) of the Arkansas State Police. Sheriff Floyd Johnson of Craighead County and his deputy Bill Findley were the principal participants of that jurisdiction. The Poinsett County authorities were headed by Sheriff Gerald Crawford and Deputy Jim Walker.

At approximately 8:00 a.m. on September 7, Findley arrived at Woodard's trailer in Trumann (Poinsett County). He informed the petitioner that they would like to question him about Mr. Baker's death at the Craighead County Sheriff's Office. Woodard agreed to accompany Findley in the police car.

The petitioner is a diabetic. He testified that he ordinarily takes his insulin in the morning after eating breakfast. On the morning of September 7, he had not yet eaten or taken his insulin. Deputy Findley and Sheriff Johnson were both aware, at this time, of Woodard's diabetic condition. Woodard testified that he informed the authorities on that morning that he had not

yet had his insulin and would need a shot. They allegedly told him that the interview would last for only a brief period and he could therefore return home for his insulin shot. Findley and Johnson deny that Woodard ever informed them about his need for an insulin shot on September 7. He was questioned until 4:30 p.m. and did not receive insulin or food, except for a candy bar and soft drink.

When Woodard arrived at the sheriff's office he was questioned by Findley, Odom and Johnson after being advised of his rights and given the standard *Miranda* warnings. He signed a form acknowledging his understanding of those rights. Woodard's statement was essentially the same one that he had given the Craighead County authorities on the two previous days, although somewhat more detailed. He stated to Lt. Odom that he arrived at Mr. Baker's house at approximately 9:15 a.m. on September 3 to put plug wires on his truck. He told Odom that he put the wires on and was then invited in to eat watermelon with Baker. While inside, Baker received a phone call from a woman (Woodard said that Baker addressed the caller as "Mam"). Woodard then told Baker that he needed to get a "dwell meter" to set the points on Baker's truck. Baker said that he would drive with him to the auto shop, but that he had to hurry back because he was expecting a call regarding his brother who was in the hospital in Memphis. Woodard then stated that he drove the truck, with Baker in the passenger seat, to Luke's Body Shop, which was located south of the Baker residence on State Highway 1. He claimed that, although the doors to the shop were open, no one was inside. He sounded his horn. He claims that a woman then looked out the window of the shop and saw them. This occurred at approximately 9:45 a.m. They then left the shop without getting the dwell meter and returned directly to Baker's house. Baker then paid for Woodard's services out of a black trifold. Woodard then claimed that he test drove the truck to determine whether it was still missing. He drove it north on Highway 1 and returned approximately five minutes later. When he returned, Woodard stated that a young man was talking to Baker under the carport. He claimed that there was a 1969 or 1970 Ford Galaxie or Fairlane parked in the drive. The car was green with a black vinyl top with a tear in the top on the driver's side. Woodard stated that he yelled at Baker that he would have to go get a dwell meter and would be back sometime later.

After leaving the Baker residence, Woodard claims that he returned to his trailer and drank a beer. At approximately 11:40 a.m. he claimed that a man from Imboden, Arkansas arrived at his trailer to purchase a dog that Woodard owned. The man's name was "Stout", "Stroud" or "Shroud" and he was driving a 1974 Chevrolet Cheyenne black pickup truck with a chain across the back. According to Woodard, this type of chain was typical for owners of "coon dogs" or "swim dogs" (the dogs were chained to the chain). The two did not negotiate a sale of the dog, and the gentleman allegedly left shortly before 2:00 p.m. Woodard then claimed to have gone to Wood Ford in Trumann, arriving there at approximately 2:10 p.m. He named several employees that he talked to there, but did not mention purchasing anything or spending any money. He claimed to have left Wood Ford at about 3:00 p.m. and then went to Stinger Sam's auto parts store in Jonesboro. He was uncertain of his time of arrival. While there he observed an automobile accident outside of the store. He talked to a witness of the wreck while the police dismantled the wreckage, etc. Woodard claimed to have been at Stinger Sam's "a good two hours", and did not mention any purchases at the store. He then went to pick up his wife from work at Frolic Footwear in Jonesboro, arriving there at approximately 5:00 p.m. Woodard then went with his wife to his mother's house in Bay for dinner, arriving there at 6:00 p.m. He said that he remembered the time because a certain television show was ending as he arrived.

A separate statement was taken by Sheriff Johnson. See, Petitioner's Exhibit 9.

This statement was essentially the same one given to Odom with a few minor differences. Woodard told Johnson that before arriving at Baker's he took his wife to work and stopped by Cato's Animal Clinic to inquire about the purchase of dogs. He told Johnson that before he began any work on the truck, Baker invited him in for watermelon. He also told Johnson that the truck was driven three times, instead of the two times as related to Lt. Odom. He explained that the first time he drove it by himself after replacing the wires. The second time he was accompanied by Mr. Baker to Luke's Welding Shop. The third time was the drive by himself to test the truck. He told Johnson that he left the Baker residence at approximately 11:00 a.m. or 11:30 a.m. and then drove south on Highway 1 to Ryan's store and bought a Coke. Sheriff Johnson also asked Woodard if he was a coon hunter. Woodard replied that he was. Johnson then asked him how long it had been since he had been on the levy south of Payneway. Woodard replied that it had been at least 30 days since he had been down there. Johnson then told him, apparently without any factual basis, that a vehicle fitting the description of Woodard's vehicle had been seen in that area "in the last few days". Woodard then replied that he had, in fact, been "at a bridge south down the levy (sic) from Payneway on Tuesday, September 2, fishing and drinking beer".

Lt. Odom testified that at the latter stages of the September 7 interview he felt that the petitioner was near to confessing to the crime. He said that tears appeared in Woodard's eyes, and that he became emotional. It was at that point, according to Odom, that Sheriff Crawford arrived at the station and advised the petitioner once again of his right to remain silent. Odom was of the opinion that this intrusion by Crawford prevented a confession. The petitioner testified that he was not near to confessing anything, and that any emotional state was brought about by his lack of insulin and food.

At the conclusion of the interview, the petitioner consented to a search of his trailer and truck. He accompanied the police to his trailer. They removed a 12 gauge pump Revelation shotgun. Woodard stated that the gun belonged to his brother, but had been in his possession for about one year. The officers also took some phone numbers found in Woodard's trailer. The only other evidence removed were samples of what appeared to be blood splatters on one of the doors of Woodard's truck.

The petitioner testified that the questioning of September 7 without his medication left him shaky and "walking around like I was drunk." He testified that his sugar count was extremely high. He checked into the Veteran's Administration Hospital in Memphis on September 8. Except for a weekend pass, he remained in the hospital for two weeks.

During this two week period the investigation into the Baker murder continued. A number of different leads were traced, but the prime suspect remained Billy Woodard.

The police discovered evidence which suggested that Mr. Woodard had no money on September 2. Greg Totty, a friend of Woodard's, told the police that on Tuesday, September 2, he did not have enough money to purchase a dog that he wanted, but that he had requested the seller of the dog to wait until Friday. He also told Totty that, "I'm flat broke"; he did not have enough money to buy Totty a coke. Nancy Utley, the owner of a local tavern in Harrisburg, stated that Billy Woodard wrote two hot checks totaling $50.00 during the month of August. She said that she spoke with Mr. Woodard about the checks on September 2 and that he told her he had no money to cover the checks. Ms. Utley also spoke with Woodard's wife, Lena, who also told her on September 2 that they had no money to cover the checks. Because of the hot checks, a warrant was issued for Woodard on September 2. Floyd Smith, an acquaintance of the petitioner's, stated that Woodard called him on August 31 and said that he needed $150.00 to pay off a gambling debt. Woodard was alleged to have said that his creditors "were going to get him" if he did not come up with the money. Smith

refused his request for a loan. Woodard repeated his request on September 1 and Smith again refused. He stated that Woodard appeared "shook up."

The investigation also uncovered evidence that the petitioner was spending money on September 3 and the following days. Leroy Baker, the humane officer with the Jonesboro City Pound reported that Billy Woodard bought three dogs, for a total of $27.00, on September 3. He also stated that Woodard bought another dog from him on September 5 for $9.00. Frank Ray, an employee of Wood Ford in Trumann, said that the petitioner was at Wood Ford for approximately 1.5 hours on September 3 in the middle of the morning. He said that Woodard bought him a coke, breaking a five dollar bill to do so. Another Wood Ford employee, Melba Wood, reported that Mr. Woodard paid $10.30 for a tuneup of his truck on September 3 and left just before noon. Several witnesses at the "Rib House", a tavern in Trumann, said that Billy Woodard was buying beers for "everybody", on the afternoon of September 3. According to one witness, he spent at least $4.00 or $5.00. Kelly Walters, a neighbor of Woodard's, reported that he sold a .25 automatic pistol to the petitioner on September 5 for $30.00 or $35.00. He stated that Woodard offered to pay for the pistol with a $100 bill, but that he (Walters) did not have the proper change. He reported that Woodard returned later with the correct change. John Paul Noble, another neighbor of Woodard's, said that on the evening of September 3 or September 4, he went with the petitioner to the A & G grocery store in Trumann and changed a $100 bill for him. He then went to the "Wagon Wheel", a tavern, and played games and drank beer. After that, Noble reported that they went back to their trailer park where the petitioner purchased a pistol from another man. Bruce Zitzelber, a friend of the petitioner's, saw the petitioner spend $11.00 or $12.00 at the TG & Y store in Trumann on September 5 for a purse for his wife and a toy for a little boy.

Some evidence was uncovered that Woodard had other sources of income. Lena Woodard reported that her husband sold a dog on September 3 for $10.00 to $15.00. She said that he used that money to buy gas for his truck. She said that Mr. Baker paid him $10.00 for his work on the truck. She said that Woodard told her that he got parts for his Volkswagon at Stinger Sam's on September 3 by trading in a gauge. She reported that Woodard told her that he had received $25.00 for selling dogs. Donna Skaggs, a wife of a friend, reported that on September 1 her husband traded a Volkswagon to Woodard for an organ, and that Woodard was due $75.00 on the transaction. This payment was made on September 6. Woodard had come by several times to collect his debt, but had been unable to find Mr. Skaggs at home. Bufford Moody told the police that on August 31 he bought a dog from Woodard and paid him $15.00. Greg Totty stated that Woodard had some money ("quite a few bills") on his person on the evening of September 3. He told Totty that he got the money from selling dogs.

In addition to checking Mr. Woodard's financial situation, the police began investigating Woodard's story for verification. A few discrepancies were discovered. Woodard had told the police that he arrived at Wood Ford at 2:10 p.m. and left at 3:00 p.m. The witnesses at Wood Ford referred to above said that he arrived sometime during mid-morning and left shortly before noon. The police could find no evidence that Mr. Woodard had been at Luke's Welding Shop with Mr. Baker on the morning of September 3. Luther Weeks, the owner of the shop, reported that he was there continuously from 8:30 a.m. on and never saw the two. His daughter, the only other person at the shop, could not remember anyone honking a car horn, or looking out the window to see who it was.

The police attempted to find a coon hunter in Imboden named Stroud, Shroud or Stout with a truck that matched the description given by Woodard. No such person could be found. Lt. Odom attended a meeting of a "swim dog" club in Imboden. No one could be found that matched the description, nor did any of the members of

the club know of such a person. The blue or green Ford described by Woodard could not be located.[1] Bill Cato, the owner of Cato's animal clinic, said that he closed his business on Wednesdays, and that Billy Woodard, a frequent customer, would have known that fact. Thus, Billy Woodard could not have been at Cato's on the early morning of September 3.

The police also developed evidence that the petitioner was familiar with the remote location where the body was found. Shirley Hill reported that she and her two sons went hunting with Woodard at that location on September 1. Mr. Russell Jones, the hunter who discovered the body, stated that he had hunted with Billy Woodard at the spot on a number of times. The last time they hunted there, Billy Woodard had parked the truck "right near where the body was found."

While the investigation focused primarily on Woodard, the police had some information implicating others. Mr. Baker's son-in-law was considered a suspect because their relationship had been somewhat violent, and there were reports that Baker had once threatened him with a gun. This lead was discounted, however, when the police discovered that Baker was going to co-sign a promissory note for his son-in-law on September 3. The police also had evidence that a blue truck was seen driving erratically away from the area where the body was found on September 3.

When Woodard returned from the hospital in Memphis on September 22, he was questioned "almost daily" by the police. Woodard testified that he thought they stopped him for questioning "about seven times" between September 22 and his confession of October 10. He was ordinarily stopped by the flashing lights of the police car while taking his wife to work. He continued to tell the police the same story that he had on prior occasions. On October 8, Mr. Woodard gave the police some new

information. He stated that on September 2 he had gone to West Memphis to transport L.S.D. from there to Jonesboro. He claimed to have received $120.00 for participating in this narcotics transaction. Lt. Odom testified that this story of a drug transaction was investigated but could not be verified. Woodard claimed at the time that the $100 bill given to John Paul Noble to cash was from this transaction.

After his statement on October 8, Woodard agreed to accompany Sheriff Johnson to the State Police Headquarters in Little Rock for a polygraph examination. Prior to the test, Woodard became ill and was hospitalized at the VA Hospital in Little Rock, and no polygraph examination was ever conducted.

On the morning of October 10, 1975 Mr. Woodard was once again stopped by the flashing blue lights of the police car while taking his wife to work. He was instructed by the officer to follow him to the Sheriff's office for questioning about the theft of some dog trophies. Upon his arrival at the Craighead County Sheriff's Office at approximately 7:00 a.m., he was questioned about the Baker murder by Sheriff Johnson and Deputy Findley after being read his *Miranda* rights. The petitioner was given an insulin shot prior to any questioning.

Sheriff Johnson called Lt. Odom in Wynne. Odom arrived in Jonesboro and began questioning the petitioner about the murder at approximately 11:15 a.m. Shortly before noon, Woodard was taken to the "I.D. Section" where he was fingerprinted and photographed. He was then placed in an unmarked police car, and went with Odom and Findley for lunch at a drive-in restaurant. After lunch the three drove to the location in Payneway where the body was found. They arrived at the scene at 1:18 p.m. After being readvised of his rights, petitioner was shown a series of photographs of the body at the scene. The officers discussed the crime and the circum-

---

1. One witness, George Finn, who directed Mr. Woodard to Mr. Baker's residence on August 27, said that Bill Woodard was driving a green "compact type" car. Other than this vague reference, there was no evidence uncovered that Billy Woodard ever drove a blue or green Ford.

stances with Woodard. At approximately 1:40 p.m. the petitioner began relating a version of the crime and confessed to the murder. Lt. Odom wrote out a ten-page statement of the petitioner's story and he signed it at 4:28 p.m.

Billy Woodard related that he arrived at Mr. Baker's house at 9:30 or 10:00 a.m. on September 3 to work on Mr. Baker's truck. He stated that he arrived at the Baker residence in his Volkswagen, which had his 12 gauge shotgun lying between the bucket seats of the car. The shotgun shells were in a pocket of the car door. After eating watermelon with Mr. Baker and changing the wires on his truck, Woodard stated that he and Mr. Baker drove to Luke's Welding Shop to get a dwell meter. Discovering no one at Luke's, the two returned to Baker's house. After regaging the plugs on the truck, Billy Woodard stated that he then test drove the truck by himself. He was gone for a few minutes and then returned. Woodard then recalled that Baker had earlier mentioned wanting to buy a house trailer. He claimed that he told Baker that he knew where there was a trailer for sale, and persuaded Mr. Baker to go with him to look at it. Mr. Woodard then related the facts of the drive to the scene where the body was found at Payneway. He described a car for sale at a particular car lot. He stated that the car would be expensive. Mr. Baker was alleged to have said that money would be no problem to him, and he then revealed a fold of money with a $100 bill showing. Woodard stated that it was at that point that he first thought of taking his money. Woodard then described in detail the back roads he took before reaching a point where his car ran out of gas. He stated that he went to the trunk of his car to get a jug of gasoline. While he was pouring the gas, he stated that Mr. Baker got out of the car to go sit under a shade tree. Woodard then claimed to have taken his shotgun (while Baker was still walking away from him), and shot Mr. Baker once in

the left back. He stated that Baker fell to the ground moaning and crawling away from him. Woodard then stated that he moved close to Baker and shot him in the back again. When he continued to moan, Woodard stated that he shot once more in the side of the head. He then stated that he drug the victim by the feet (causing his shoes to come off) into the woods. Woodard then stated that he picked up the shotgun shells, the victim's wallet, and his shoes, and put them in the floorboard of his car. He stated that he threw Baker's glasses into an adjacent bean field. On his return trip, he stated that he threw the wallet (after taking its contents), the shoes, and the shotgun shells into a drainage ditch. After his confession, Billy Woodard was placed in the custody of Sheriff Gerald Crawford of Poinsett County. After spending that night in jail, Mr. Woodard gave two more statements the following day, essentially identical to the one given on the 10th. One statement was given to Deputy Walker and recorded. The other was written in long hand by Sheriff Crawford. Also on October 11, the petitioner accompanied the police to a floodway ditch near the location where the body was discovered. It was in this ditch that Mr. Woodard stated that he threw the victim's wallet, shoes, and the expended shotgun shells. While at the scene, Woodard spoke with a television reporter about the circumstances of the crime, and expressed some remorse for having committed the murder.

On the basis of all of the facts and circumstances known to the police on the morning of October 10, the Court concludes: (1) that a reasonably competent attorney would not have been obligated, under the applicable constitutional standards, to raise a Fourth Amendment challenge to the petitioner's confessions; and (2) that the petitioner was not materially prejudiced by his attorney's failure to make that challenge. In sum, the Court concludes that there was probable cause to arrest the petitioner.[2]

---

**2.** The Court assumes in this analysis that Woodard was "siezed" for Fourth Amendment purposes on the morning of October 10. While the

Court's conclusion that there was probable cause makes a resolution of this issue unnecessary, it was quite clear at the evidentiary hear-

**1560**

The Court's conclusion is based primarily on the fact that the petitioner was the last person seen with the victim alive. After a month of investigation, law enforcement authorities from three jurisdictions could not locate any other person who had any contact with the victim after Mr. Woodard. A number of courts have found probable cause based on similar circumstances. In *Bishop v. Wainwright*, 511 F.2d 664 (5th Cir.1975) the petitioner was convicted of murder and sentenced to death. His petition for a writ of habeas corpus was denied. Both the U.S. District Court for the Southern District of Florida and the Fifth Circuit Court of Appeals rejected the petitioner's contention that his warrantless arrest was without probable cause. The Fifth Circuit concluded that probable cause existed on the following facts: the petitioner was the last person seen talking to the two murder victims; he later told a friend he had seen two corpses in the woods; and he led that friend to the place where the bodies were found approximately two weeks after the murders.

The Court does not accept the petitioner's argument that the statement of Ona Downs indicates that he was not the last person seen alive with Mr. Baker. She stated that she thought she saw Mr. Baker driving his truck by himself at 10:00 or 10:30 a.m., which would have been after the time when Woodard claimed to have left the Baker residence. She stated, however, that she was not sure that it was Baker, and that it was unusual that he did not wave or honk as he normally did. The police could have concluded that Ms. Downs was confused as to time, and that it was actually Woodard driving the truck, as Woodard himself admitted he had done. While Mr. Baker was a 65 year old gentleman and Mr. Woodard was, as petitioner's brief describes him, a "long-haired teenager" (actually Billy Woodard was 22 at the time), the perception of eyewitnesses is often questionable, a fact that the police were well aware of. The fact that there was a single person driving Mr. Baker's truck may have triggered the perception in Ms. Downs that it was in fact Mr. Baker driving. In any event, even if construed in the light most favorable to the petitioner, Ms. Downs' statement does not establish that anyone else was seen with Mr. Baker.

While the fact that Woodard was the last person seen with Baker might not have been enough, by itself, to establish probable cause, taken along with the other facts and suspicious circumstances it sufficed to establish the reasonable grounds necessary for such a finding. Foremost among these facts were the incriminating financial circumstances. Mr. Woodard was desperate for money on September 2, and had money to spend on September 3. He had a $100 bill in his possession which he requested that another person cash for him. To be sure, the petitioner came up with some explanations for his new found wealth. In determining probable cause, however, the police are entitled to weigh the evidence, including assessing the credibility of the witnesses. Common sense must be applied to determine what is the likely truth.

> The process (for determining probable cause) does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

*Illinois v. Gates*, —— U.S. ——, ——, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) (quoting, *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). A "common-sense conclusion about human behavior" would certainly permit the police to conclude that Billy and Lena Woodard's explanations were untrue and

---

ing that Woodard was arrested, as that term is defined by *Dunaway v. New York* and its progeny.

self-serving. It was certainly common sense to disbelieve them in light of the suspicious circumstances related by Floyd Smith and John Paul Noble.

Also relevant to the determination of probable cause was the fact that the petitioner was familiar with the remote isolated area where the body was found. Indeed, Woodard had been to that very spot the day before the murder, a fact which he initially denied upon questioning by Sheriff Johnson on September 7. See, e.g., *United States v. Skinner,* 412 F.2d 98 (8th Cir.1969), *cert. denied,* 396 U.S. 967, 90 S.Ct. 448, 24 L.Ed.2d 433 (Probable cause existed where the defendant was observed by police officers in the geographic vicinity of the robbery, and matched the general physical description of the suspect). In addition, the petitioner was in possession of the same type of weapon that was used in the murder. *See, Hairston v. Peyton,* 282 F.Supp. 907 (W.D.Va.1968) (Probable cause existed where the defendant had been in the vicinity of the crime and possessed a knife fitting the description of the one used in the crime).

The police were also entitled to rely on the fact that some of the information given by Woodard concerning his whereabouts on September 3 could not be verified. A Mr. "Stroud" or "Shroud" could not be located in Imboden. The petitioner's explanation of the time spent at Wood Ford did not check out with the statements of the employees there. No one saw Woodard and Baker together at Luke's Welding Shop. While some of those inconsistencies are not necessarily inculpatory, and while the police are not entitled to base probable cause solely on the basis of the failure of their investigation to turn up exonerating evidence, those discrepancies must be considered along with the totality of the other circumstances.

The petitioner's argument that the police themselves did not believe they had probable cause on October 10 is not relevant to this analysis. The subjective view of the police is not in question. The inquiry on habeas review is whether the objective facts known to the police at the time suffice to constitute probable cause. *Ricehill v. Brewer,* 459 F.2d 537, 539 (8th Cir.1972). Furthermore, three different jurisdictions were involved, with all three conducting separate interviews of witnesses. "In order for an officer to have probable cause to make an arrest ... it is not necessary that he have personal knowledge of all items of information which taken together constitute probable cause. The court looks to the collective knowledge and information of all of the officers involved." *United States v. Rose,* 541 F.2d 750, 756 (8th Cir.1976).

Finally, the Court considers as only marginally relevant the petitioner's evidence that other leads were not traced. While that may be a criticism of the conduct of the investigation, and may be evidence which could be introduced at trial to attempt to persuade the jury that the petitioner was not the man who committed the murder, it does not bear directly on the evidence which pointed to Billy Woodard.

After careful review of all of the information available in the investigative file, the Court concludes that probable cause existed for Woodard's arrest. While in hindsight it probably would have been advisable for Woodard's trial counsel to raise the Fourth Amendment issue on the slim chance that such a claim might be successful, counsel was not constitutionally obliged to raise such a claim.

> Every trial presents a myriad of possible claims. Counsel might have overlooked or chosen to omit (a particular claim) while pursuing other avenues of defense. We have long recognized, however, that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim.

*Engle v. Isaac,* 456 U.S. 107, 133, 102 S.Ct. 1558, 1574, 71 L.Ed.2d 783, 50 U.S.L.W. 4376, 4383 (1982).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL—FAILURE TO INVESTIGATE THE PETITIONER'S MEDICAL CONDITION

As noted, Billy Woodard was and is a diabetic. He argues that his trial counsel

was ineffective in failing to investigate the precise nature of his disease as it related to various defenses and trial strategies. Specifically, he maintains that his diabetes could have affected his mental state at the time of any alleged murder, that the emotional state produced by his diabetes rendered his confessions involuntary, and that the nature of his disease would have been important mitigating evidence at the penalty phase of the trial.

Mr. Woodard was represented at trial by Mr. Burk Dabney, court-appointed counsel. Mr. Dabney filed a motion to suppress all the confessions as involuntary. That motion did not raise the issue of Mr. Woodard's diabetes. Mr. Dabney's challenge to the confession was based on the petitioner's story that he was physically abused and threatened by Odom and Findley on October 10. Woodard did not inform his attorney that his diabetes contributed to the breakdown of his will on that day. Mr. Dabney did not attempt to obtain his client's medical or hospital records. He did, however, telephone Woodard's physician, Dr. John Faris of Jonesboro. Mr. Dabney testified at the habeas hearing that he inquired of Dr. Faris about Mr. Woodard's diabetes, and the effect of that disease on his involvement in the offense charged. Mr. Dabney testified that Dr. Faris told him that his testimony would be of no help to the petitioner, and would in fact hurt his case. Mr. Dabney did not follow up on any further inquiry of Dr. Faris.

Dr. Faris testified in this case by way of deposition. He stated that he remembered the telephone conversation with Mr. Dabney, but had absolutely no recollection of what was said. He did not remember, as petitioner's counsel tried to suggest, that he asked Mr. Dabney to drop by his office for a personal in depth interview. Dr. Faris testified that during the time that he treated Mr. Woodard, he found nothing to indicate that his diabetic condition had any drastic effect on his mental state, including those times when his condition deteriorated to ketoacidosis, requiring hospitalization. Dr. Faris testified that he was familiar with diabetics, and had treated a number of

them. He stated that he was also familiar with the physical and emotional states induced by hyperglycemia (high blood sugar) and hypoglycemia (low blood sugar). He acknowledged that it was difficult for lay persons, and even physicians to recognize when a diabetic was suffering from these extreme conditions. It was his opinion that patients can recognize the onset of these conditions. He stated that Billy Woodard recognized them to the extent that he knew when to check into the hospital.

Dr. Faris testified that he did not like Mr. Woodard as a person. He characterized him as a man with poor judgment, a character trait which he said was totally unrelated to his diabetes. He testified that the petitioner had a bad temper, and often refused to follow his (Dr. Faris') medical advice, particularly with regard to his diet. He also testified that Billy Woodard never paid his bills. He noted that when Mr. Woodard suffered from severe ketoacidosis, he would become more "agitated."

At the hearing on Mr. Woodard's motion to suppress, he testified that he did not commit the murder. He claimed that he was physically beaten and that his life was threatened by Deputy Findley on October 10. It was his testimony that the statements given to the Poinsett County authorities on the following day were made out of fear that a contrary statement would place him back in the hands of the Craighead County Sheriff's Department, where he feared for his life. Mr. Dabney asked him about his interrogation without food or insulin on September 7, and his subsequent hospitalization on September 8. Mr. Woodard testified that he was given his insulin shot on October 10, and was given lunch. He also noted that he had suffered a severe diabetic reaction while incarcerated in the Poinsett County Jail. He did not testify that his diabetic condition affected his mental state on October 10. Mr. Dabney offered no expert medical testimony in support of that position.

Both Lt. Odom and Deputy Findley denied that Mr. Woodard was in any way

threatened or abused on October 10. Sheriff Crawford and Deputy Walker testified about the statements made by the petitioner on October 11. Both testified that Woodard promptly informed them that Odom and Findley "had been mean" to him. Sheriff Crawford testified that he didn't think that Woodard told him that he had been beaten, only that he was afraid of the two officers. Neither Crawford nor Walker testified that Woodard mentioned anything about his mental state or diabetes, on the previous day.

The trial judge, the Honorable Gerald W. Pearson, ruled at the conclusion of the hearing that the confessions were voluntary and could be admitted into evidence.

At trial Mr. Woodard testified and told essentially the same story that he did at the suppression hearing. He testified once again about the deprivation of insulin on September 7, and his frequent hospitalizations (including the two weeks following September and the hospitalization in Little Rock on October 8). Mr. Dabney elicited testimony from Mr. Woodard to the effect that his illness was the cause of his inability to hold a steady job. All statements made by Mr. Woodard, including the statement made to a television reporter on October 11, were introduced. The jury returned a verdict of guilty.

At the penalty phase of the trial, Mr. Woodard did not testify. Mr. Dabney called two witnesses, both aunts of the petitioner. Both testified that Billy Woodard was a peaceful person and was not a "troublemaker." Both noted that he served in the Army, and both noted that he was a diabetic. One of them described the effect of the diabetes on the petitioner's behavior, and testified that sometimes he "did not act like himself."

At the evidentiary hearing on the petition before this Court, the petitioner called Dr. Stephen Leichter. Dr. Leichter practices medicine at the University of Kentucky Medical Center, specializing in the treatment of diabetes. He is the medical director of the Kentucky Diabetes Center and rector of the Kentucky Diabetes Foundation. He was accepted by the Court as an expert.

He testified that Billy Woodard was and is a "type I" diabetic—juvenile onset with an absolute deficiency in the production of insulin. He stated that Mr. Woodard must have regular doses of insulin to avoid a hyperglycemic crisis (where the blood sugar is too high). He testified that Mr. Woodard was maintained on NPH insulin which delays the onset of insulin action—the patient feels the effect of the insulin within 2 to 4 hours. If the insulin is not received, then the blood sugar increases and a person with type I diabetes can suffer from ketoacidosis—a condition brought about by hyperglycemia, high blood sugar.

According to Dr. Leichter, a hyperglycemic crisis can affect the patient's mental state and decrease one's alertness. The patient may become irritable, cross, and less tolerant. He also stated that patients in such a condition can exhibit abnormal behavior. Dr. Leichter noted the example of a patient who refused to take her insulin, and slapped her husband when he tried to counsel her.

Dr. Leichter's testimony regarding the petitioner was based on his examination of the petitioner's medical records. His examination of the records prior to 1975 led him to the conclusion that Billy Woodard had uncontrolled diabetes; he often had high blood sugar which resulted in severe hyperglycemia. He characterized Mr. Woodard as a "brittle diabetic"—one with wide uncontrolled swings in blood sugar levels. He testified that when the petitioner was admitted to the VA Hospital in Memphis on September 8, 1975, he was suffering from ketoacidosis and was diagnosed as a poorly controlled type I diabetic. With respect to his hospitalization in Little Rock on October 8, he stated that Mr. Woodard was released with "unresolved acedosis." With respect to the confession of October 10, he noted that Mr. Woodard's insulin shot was delayed until approximately 10:00 a.m., that he received NPH insulin which was not fast acting, and that it was therefore "likely" that Billy Woodard was suffering from ab-

normally high blood sugar during the afternoon hours of October 10. He testified that this "possibly" could have had an effect on his mental state which would not necessarily have been evident to observers. Moreover, Dr. Leichter testified that the onset of the condition would not necessarily have been evident to Mr. Woodard. He stated that patients often become accustomed to the feelings of disorientation and emotional instability.

Dr. Peter Kohler testified for the respondent. He is the current chairman of the University of Arkansas Medical School. He was accepted by the Court as an expert. He testified that patients with high blood sugar suffer from lethargy, nausea and extreme irritability. He indicated that a number of patients have observable physical symptoms while others do not. It was his opinion that violent behavior may be induced by extremely low blood sugar, hypoglycemia, but not by high blood sugar. He testified that in the medical records available, there was only one instance of hypoglycemia in Mr. Woodard's history. Dr. Kohler acknowledged that hyperglycemia can lead to confusion and disorientation, and that the stress of interrogation can worsen the effects.

On the basis of all the evidence, the Court concludes that Mr. Dabney's investigation and presentation of Mr. Woodard's medical condition did not fall below the standard of a reasonably competent attorney. Even if it could be said that trial counsel breached some duty to his client, it is clear to the Court that no prejudice resulted.

The Court bases its conclusions on the following pertinent facts: (1) Mr. Woodard never informed his attorney that his medical condition contributed to his involuntary confession; (2) Dr. Faris' observation and treatment of Mr. Woodard suggested to trial counsel that such a defense was not advisable; (3) Mr. Dabney did inquire of Dr. Faris about the possibility of raising such a defense; and (4) Mr. Dabney did elicit testimony from Mr. Woodard about the effects of his diabetes and his frequent hospitalizations. While it is evident that testimony such as Dr. Leichter's would have been helpful to Mr. Woodard's case, the Court is doubtful that Judge Pearson's ruling on the admissibility of Mr. Woodard's confessions would have been any different had he heard such testimony. While Dr. Leichter indicated that the effects of hyperglycemia might contribute to the breakdown of a particular patient's will, there was nothing in his testimony to establish that a diabetic would confess to a murder which he did not commit *because* of the effects of the disease.

The petitioner argues that he need not conclusively establish prejudice, but must only prove "the existence of admissible evidence which could have been uncovered by reasonable investigation and which would have proved helpful to the defendant either on cross-examination or in his case in chief in the original trial. Once this showing is made, a new trial is warranted unless the Court is able to declare a belief that the omission of such evidence was harmless beyond reasonable doubt." *McQueen v. Swenson*, 498 F.2d 207, 220 (8th Cir.1974). The instant case does not present a case such as *McQueen* where the alleged incompetence was the failure to discover certain exculpatory information relating to the facts of the crime. The Court here is faced only with trial counsel's failure to seek expert assistance, for it is clear that Mr. Dabney knew about the petitioner's diabetes, and made some inquiry about the circumstances of that disease both at the suppression hearing and at trial.

In *Knott v. Mabry*, 671 F.2d 1208 (8th Cir.1982) the Court of Appeals ruled that trial counsel was not ineffective for failing to seek expert assistance to rebut crucial evidence presented by the State Toxicologist. That evidence constituted a substantial portion of the case against the petitioner, and was the only direct evidence linking him to the scene of the crime. The defense counsel chose to limit his cross-examination of the toxicologist to common-sense factual inquiries that he testified were designed to better appeal to a jury. The Eighth Circuit

reversed this Court's grant of the writ of habeas corpus.

Although petitioner's trial counsel probably should have increased his knowledge of the relevant scientific techniques and principles by consulting an expert . . . we have difficulty in light of the existing record holding that counsel's representation was constitutionally inadequate. Human nature is such that most people think they have a better understanding of the demands of an event after it has happened. Trial of law suits is peculiarly susceptible to hindsight appraisal of another lawyer's endeavors.

*Id.* at 1212.

Here trial counsel investigated the medical condition of the petitioner to the extent of questioning his treating physician. When that physician did not offer any helpful information, Mr. Dabney did not pursue the matter further. Mr. Dabney did not testify that there was any strategic reason why he chose not to pursue any expert medical assistance, only that he considered the matter of petitioner's diabetes essentially a non-issue. The Court cannot say that counsel is constitutionally obliged to inquire further than the defendant's treating physician. This is particularly true when it is realized that had Mr. Woodard called someone like Dr. Leichter to testify, the State would no doubt have called Dr. Faris to the Stand. He would have given the generally unfavorable report that he gave in his deposition.

The issue is much closer with respect to trial counsel's failure to seek expert medical assistance in the penalty phase. Mr. Dabney did raise the issue of Woodard's diabetes during the penalty phase. He introduced the testimony of the two aunts, and argued the disease as a mitigating circumstance. While expert testimony would have aided his argument, the Court concludes that trial counsel's failure to elicit such testimony is not a sufficient basis to vacate the death penalty. This is not a case like *Neal v. State,* 274 Ark. 217, 623 S.W.2d 191 (1981) in which the Arkansas Supreme Court vacated the death penalty because

trial counsel failed to pursue at the penalty phase evidence of diminished mental capacity. In that case the defendant allegedly suffered from organic brain syndrome and raised the defense of insanity at trial. Here, the defendant did not raise the defense of mental disease or defect at trial. Indeed, that defense would have been somewhat inconsistent with defendant's theory that he did not commit the murder, but was instead coerced into confessing.

■ Mr. Dabney offered his client's medical condition as a mitigating circumstance. The Court concludes that where counsel has no reason to believe that the disease rises to the level of a "mental disease or defect" as was the case in *Neal,* he has not rendered ineffective assistance by failing to produce expert testimony at the penalty phase of the trial. Here, not only would the theory of a mental disease or defect conflict with the petitioner's defense, but the report of the state psychiatrist who examined Mr. Woodard after his arrest mentioned nothing about the effect of his diabetes on his mental state. Based on those circumstances, the Court concludes that Mr. Dabney was not ineffective in failing to proffer expert medical testimony on the issue of Mr. Woodard's diabetes.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL—FAILURE TO CALL ALIBI WITNESSES

■ The petitioner argues that his trial counsel was ineffective for failing to call two alibi witnesses to the stand. Those two witnesses were Frank Ray and Melba Wood, employees of Wood Ford in Trumann. Both told the police that Billy Woodard was at Wood Ford in the middle of the morning, stayed for approximately 1.5 hours, and left just before 12:00 noon. These two statements were contained in the police investigative file which was available to Mr. Dabney.

Mr. Woodard's confessions placed him at the scene of the murder at approximately 10:00 or 10:30 a.m. He therefore argues that the above statements were inconsistent with his confession, and would have sup-

ported his theory that the confessions were untrue and were coerced.

Mr. Woodard told the police prior to October 10 that he left the Baker residence at approximately 10:00 a.m. and made several stops before he proceeded to Wood Ford. He claimed that he arrived there at 2:10 p.m. and left at 3:00 p.m. Mr. Woodard did not relate any specific time sequences in his testimony at trial. Indeed, at trial he did not mention going to Wood Ford on September 3. His attorney did not question him about his activity after he left the Baker residence.

Mr. Dabney testified at the habeas hearing that Frank Ray was not used as a witness because his testimony would have conflicted with the petitioner's own version of events.

In light of the above statements, the Court cannot say that Mr. Dabney's tactical judgment on this issue amounted to ineffective assistance of counsel. Mr. Dabney could certainly have concluded, in the exercise of sound professional judgment, that the statements of Ray and Wood would reflect adversely on his client's inclination to testify truthfully.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL—FAILURE TO PREPARE FOR AND DEVELOP EVIDENCE AT THE PENALTY PHASE

In addition to the issue regarding petitioner's diabetes, he argues that his trial counsel otherwise failed to adequately prepare for, and present evidence at the penalty phase of the trial. As noted, Mr. Dabney called two witnesses at the penalty phase, petitioner's aunts, who revealed that he had diabetes, was a veteran, and was a peaceful person. Mr. Woodard did not testify in his own behalf. Mr. Dabney argued to the jury that Billy Woodard was a young man, that he had served his country, and that he had a serious illness. The Court has carefully reviewed the transcript of Mr. Dabney's jury argument at the penalty phase. At best, his analysis of the jury's duties with respect to the aggravating and mitigating circumstances provisions can be described as cursory. Mr. Dabney went down the check-list that was provided to the jury, and argued whether or not the particular aggravating or mitigating circumstance applied in Mr. Woodard's case.

Billy Woodard testified at the habeas hearing that he would have welcomed the opportunity to testify at the penalty phase, but that he was never asked to do so by his attorney. He testified that, had he been given the chance, he would have told the jury that he had several worthwhile skills which he could cultivate in prison—agricultural and mechanical skills. He also claimed that he would have testified that he got along well with young people, and would have been able to counsel younger prisoners not to make the same mistakes that he had made. Woodard stated that although he would have continued to profess his innocence, he would have admitted that there were certain mistakes he had made for which he would ask the jury's understanding. As petitioner puts it in his post-trial brief: "Woodard also acknowledged that he had done some things in his past that had led to his present conviction. He pointed out that he would counsel younger persons to change their lives and avoid the situation he had placed himself in. It was acknowledged during the hearing that Woodard had had problems with writing hot checks and had had some experience with drugs. It was also pointed out that he had not been entirely faithful to his wife." Petitioner's Post Hearing Brief at 45. Woodard also stated that he would have expressed sympathy for Mr. Baker's family.

The petitioner also presented the testimony of Floyd Inzer, his brother. Mr. Inzer testified that if called, he would have testified that Billy Woodard was a good worker and a nonviolent person. He testified that he was never contacted by Mr. Dabney. He stated that he did not attend his brother's trial because he was "nervous."

The petitioner also produced, by way of deposition, the testimony of Irene Jones. She lived next door to Mr. Woodard's parents, and her sons were friends of his. She stated that she thought that Mr. Woodard was a good worker, and she thought highly

of him personally. She was not contacted by Mr. Dabney about testifying in the petitioner's behalf. She also stated that she saw very little of Mr. Woodard in the two or three years prior to his trial, and that she really didn't have much of an opportunity to observe his work habits.

Mr. Dabney testified at the habeas hearing that he did not give that much consideration to preparing the penalty phase of the trial. This was his first capital trial, and he testified that he was unfamiliar with the bifurcated procedure under the new Arkansas death penalty statute. His primary emphasis was on the guilt phase. He testified that he fully expected to obtain an acquittal for his client. Mr. Dabney testified that he considered calling the petitioner to testify, but decided that it would be cumulative to the ground already covered by his testimony at the guilt phase.

In the two habeas cases involving the death penalty from this district, both Judge Overton and Judge Woods have held that the failure to put on evidence or argument during the penalty phase of the trial was not ineffective assistance of counsel. *Collins v. Lockhart*, 545 F.Supp. 83 (E.D.Ark. 1983), *rev'd and remanded on other grounds,* 707 F.2d 341; *Pickens v. Lockhart,* 542 F.Supp. 585 (E.D.Ark.1982). In each of those cases there was evidence available that the defendants had had a particularly deprived childhood and were beaten by their fathers. Their life histories suggested a pattern of criminal behavior and influence and domination by certain criminal elements. In each case the Court concluded that the decision not to put on such evidence was a matter of trial strategy which could not be second guessed on habeas corpus review.

Mr. Woodard's case is substantially different. There was no evidence that Mr. Woodard's childhood or family history had been particularly traumatic. He had no history of violent behavior. He had no criminal record, other than arrests for minor crimes. The petitioner's theory is that his trial counsel erred in failing to put him on the stand to attest to his human quali-

ties, and in failing to call witnesses who could have testified about his good points.

At the outset, the Court would point out that it finds no constitutional error in failing to call either Mr. Inzer or Ms. Jones to testify in the petitioner's behalf. The Court had the opportunity to assess the testimony of Mr. Inzer at the habeas hearing and found nothing in his testimony that would have added a great deal to the petitioner's mitigation claim. His comments were general, and did not appear to be based on any intimate knowledge of or relationship with the petitioner. The Court finds it difficult to believe that Mr. Inzer's statements would have influenced the jury to any extent. Ms. Jones' deposition reveals that her recollection of the petitioner was based largely on her perceptions of him as a boy. The Court was left with the impression that she really did not know him all that well, as an adult.

The critical question is whether Mr. Dabney was constitutionally obligated to call his client as a witness at the penalty phase, and whether Billy Woodard was materially prejudiced by that failure. This is a most difficult question. In the final analysis, the Court concludes that Mr. Dabney's penalty phase presentation was constitutionally adequate. This conclusion is based on the following: (1) Mr. Woodard, had he testified as he stated he would, would have continued to deny complicity in the crime, and therefore would have expressed no remorse; (2) any statements by the petitioner expressing sorrow for the Baker family, or sorrow for mistakes in his life, would have been inconsistent with his statement that he had nothing to do with the murder; (3) petitioner's expression of past mistakes would have been more aggravating than mitigating; (4) petitioner's occupational skills, at least his mechanical abilities, were already before the jury through his testimony at the guilt phase; and (5) petitioner's testimony regarding his worthwhile occupational skills and personal values would have subjected him to damaging cross examination. As pointed out by respondent and tacitly acknowledged by the petitioner, Mr.

Woodard did not lead a model life, even though he did not have a history of criminal activity. His wife supported him. Although he offered his diabetes as a justification for his inability to hold a steady job, it was evident that he spent most of his time hunting and drinking with his friends. And, as petitioner acknowledges, he was not a faithful husband. While those circumstances were not necessarily aggravating in the sense that a jury might consider them material factors in deciding to assess the death penalty, they are facts which would tend to negate the qualities that Mr. Woodard might have offered in mitigation. Furthermore there was evidence, as noted by his physician Dr. Faris, that Mr. Woodard's diabetes was not debilitating, *per se,* but that he manipulated his condition to get what he wanted.

The Court's conclusion is troublesome because Mr. Dabney candidly admitted at the habeas hearing that he did not give much consideration to the penalty phase, and did not really prepare for it. Given the qualitative difference of the death penalty over all other forms of punishment, and given Mr. Dabney's dearth of preparation, the Court might conclude that the penalty phase presentation amounted to ineffective assistance of counsel. In that event, the Court would remand the case to the trial court for a second penalty phase. This alternative, however, would evade the difficult question of whether Mr. Dabney's penalty phase presentation materially prejudiced Mr. Woodard in light of the record developed by Mr. Woodard's habeas counsel. The petitioner has been represented by his current attorneys since the preparation and filing of his Rule 37 petition. All of the evidence they have been able to uncover, and the various theories of mitigation which they have developed over years of hindsight analysis, do not persuade the Court that the jury which heard the case would have decided the question of punishment any differently. In the final analysis, the testimony of Billy Woodard and that of a few relatives and friends, would have done little to offset the heinous nature of this particular crime.

In addition, the Court is charged with the responsibility of evaluating the credibility of the witnesses presented at the habeas hearing. That responsibility often requires looking beyond the bald statements of the witnesses. Mr. Dabney's testimony was generally favorable to the petitioner. He stated that he believed that Mr. Woodard was innocent and that he still holds that belief. He stated that he devoted all of his energies to obtaining an acquittal for his client. On the question of how well he prepared the penalty phase, an answer to which he knew could determine the life or death of his former client, Mr. Dabney chose to say that he gave no thought to the penalty phase. He did think about the matter enough, however, to have available two character witnesses (those two witnesses would have had no relevant testimony at the guilt/innocence phase) and to consider whether or not to call his client to the stand. In any event, had Mr. Dabney followed all of the steps that habeas counsel suggest would have been appropriate for a proper penalty phase presentation, the Court sees little likelihood that the jury would have spared petitioner's life.

## VI. EXCLUSION OF DEATH–SCRUPLED VENIREMEN FROM THE GUILT PHASE OF THE TRIAL

 Mr. Woodard argues that his sixth and fourteenth amendment rights to a fair trial were violated because the trial court excluded death-scrupled veniremen from the guilt phase of the trial. This argument (hereafter the "Grigsby" claim) was specifically left open by the United States Supreme Court in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and addressed by this Court in *Grigsby v. Mabry,* 483 F.Supp. 1372 (E.D.Ark.), *rev'd and remanded,* 637 F.2d 525 (8th Cir. 1980).

The petitioner did not raise this issue at trial or on direct appeal. It was first raised in his Rule 37 Petition before the Arkansas Supreme Court. On similar facts, this Court has held that the failure to raise the *Grigsby* issues at trial or direct appeal constitutes an adequate and independent state

procedural ground to bar federal habeas review. *Hulsey v. Sargent,* 550 F.Supp. 179 (E.D.Ark.1981). *See, Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). At the direction of the Court, both parties have briefed the issue of whether the decision in *Hulsey* controls Mr. Woodard's *Grigsby* claim. The Court concludes that it does. Mr. Woodard's assertion of the *Grigsby* claim came too late for the Arkansas courts to consider it on its merits. And, because the petitioner has not satisfied the "cause" prong of the cause and prejudice standard, *Wainwright* precludes the Court from considering the claim.

Mr. Woodard distinguishes *Hulsey* by noting that he presented his *Grigsby* claim to the Arkansas Supreme Court in his original Rule 37 petition, while Mr. Hulsey waited until a petition for rehearing of the denial of the Rule 37 petition to present the *Grigsby* claim. This distinction is without practical or legal significance. The general state procedural rule is that issues not raised at trial or on direct appeal cannot be addressed on the merits in a Rule 37 petition. The Arkansas Supreme Court has created an exception for those claims which are termed "so fundamental as to render the judgment void and open to collateral attack." *Neal v. State,* 270 Ark. 442, 605 S.W.2d 421, 424 (1980). A claim of such a "fundamental" nature could be addressed at either the original petition or in a petition for rehearing. The point is, state procedural rules preclude consideration of previously unraised claims *unless* those claims are so fundamental as to render the conviction void. If such a fundamental claim is presented, the Arkansas Supreme Court has stated that it *must* address the merits of the claim, regardless of when it is presented. Thus it is clear that the distinction between an original petition and a petition for rehearing is meaningless. That is why this Court treated Mr. Hulsey's claim as if it had been raised in the initial Rule 37 petition. The inquiry there was whether the Arkansas court on the petition for rehearing considered the claim so fundamental that it had to be addressed on its merits. That court has not reversed its

opinion about the fundamental quality of that claim since *Hulsey.*

The petitioner nonetheless contends that the Arkansas Supreme Court did, in fact, consider his *Grigsby* claim on its merits. The Supreme Court's discussion of the issue was as follows:

Petitioner further argues that the court erred in excluding death-scrupled veniremen from the jury panel in violation of the Sixth and Fourteenth Amendments as set out in *Witherspoon v. Illinois,* 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776] (1968), and its progeny. *Witherspoon* was one of the most widely established doctrines in criminal law at the time the petitioner was tried. Surely, an objection would have been made to the seating of a juror which the petitioner thought was not qualified to serve. Certainly such argument would have been carried forth in the initial appeal if there were any substance to the arguments now presented. From the excerpts of the voir dire transcript it appears that the court excluded jurors who stated they did not believe in the death penalty. It is fair to say that these jurors expressed conscientious scruples in opposition to the death penalty. Since this matter could have been initially argued and we do not see anything which would render judgment void, we do not find reversible error. In other words, it does not appear that it is possible the sentence was imposed in violation of the Constitution or laws of the United States or of this state.

273 Ark. at 238–9, 617 S.W.2d 861. At the conclusion of the opinion, the court made the following comments:

It appears that the petitioner does not understand the purpose of Criminal Procedure Rule No. 37. It is not intended to provide a review of mere error in the conduct of the trial or to serve as a substitute for appeal. *Clark v. State,* 255 Ark. 13, 498 S.W.2d 657 (1973). It also seems that petitioner feels that any error is subject to collateral attack. Unless an allegation raises issues so fundamental as to render the judgment void, such issues

cannot be raised by the use of Rule 37. *Orman v. Bishop,* 245 Ark. 887, 435 S.W.2d 440 (1968); *Moore v. Illinois,* 408 U.S. 786 [92 S.Ct. 2562, 33 L.Ed.2d 706] (1972). Issues not raised by appellant in his original appeal are considered waived unless they are so fundamental as to render the judgment void. *Wicks v. State,* 270 Ark. 781, 606 S.W.2d 366 (1980).

*Id.* at 240, 617 S.W.2d 861.

Mr. Woodard argues that the court dealt with the merits of his argument based on "*Witherspoon v. Illinois...* and its progeny." He argues that this reference to the cases following *Witherspoon* suggests that the court was dealing squarely with the *Grigsby* claim. He further argues that the Court considered the issue fundamental because it examined the voir dire transcript and found nothing "which would render the judgment void."

This Court disagrees. If the Arkansas court had intended to deal with the merits of the *Grigsby* claim, it would have specifically mentioned it. As noted in *Hulsey:*

Although both *Grigsby* and *Witherspoon* raise the question of an impartial jury, they are distinctly different. A finding that one issue is "fundamental" for these purposes does not necessitate a finding that the other is as well. This is especially true since the Supreme Court in *Witherspoon* established a *per se* rule requiring the invalidity of the death sentence in certain circumstances, whereas it only invited the petitioner to make a record in an attempt to prove the *Grigsby* claims.

550 F.Supp. at 184. The context of the Arkansas court's treatment of Mr. Woodard's claim reveals that it dealt with the *Witherspoon* claim, not the *Grigsby* issue. It is clear to the Court that the Arkansas Supreme Court examined the voir dire transcript to ascertain whether the requirements of *Witherspoon* were complied with; not whether the death-qualified jury was unconstitutional.

Mr. Woodard maintains that the Arkansas Supreme Court's assessment of whether a particular issue is "fundamental" is a question of federal constitutional law, not state procedural law. That argument was specifically rejected in *Hulsey:*

Defining the contours of the "fundamental" quality of a constitutional right, as that term is used in the exception allowing some issues to be raised for the first time in a Rule 37 petition, would be a matter of state procedural law. It is true that the substantive content of the right would effect the determination. However, the final decision as to which claims should be allowed to be raised at such a late time would be a matter of state rather than federal law.

*Id.* at 185.

Petitioner also argues that the discretion of the state court to decide whether a particular issue is or is not fundamental eliminates the procedural default as a bar to federal habeas review. Otherwise, he argues, the state court would have the unlimited discretion to determine access to a federal forum to litigate federal claims.[3] This argument is based on *Williams v. Georgia,* 349 U.S. 375, 75 S.Ct. 814, 99 L.Ed. 1161 (1955). In *Hulsey,* this Court chose not to follow the exception of *Williams* because,

The discretion exercised in *Williams* and the decision made by the Arkansas Supreme Court in *Hulsey* are different. In *Williams* both the trial court and the appellate court had the power to hear the defendant's claim, but decided, given the circumstances of the case and the lack of explanation for the delay, that such power should not be exercised.

Under Arkansas procedure, the Supreme Court had the power to review the claims raised in the Rule 37 petition only if it would void the conviction or the sentence imposed, and in such circumstances it *had* to review the claim. The analysis of the Arkansas Court in this decision was limit-

---

**3.** Petitioner's argument is limited, of course, to the narrow circumstance where the particular federal constitutional claim was not asserted at trial or appeal. Where the claim is presented at trial, the federal courts have the power to collaterally review a state court's assessment of federal constitutional law.

ed to the particular issue raised and the legal effect thereof; a review of the facts of the case and the circumstances involved in the procedural default does not appear to be contemplated. There is nothing from which this Court could find that the Arkansas Supreme Court has applied the rule governing default of the Grigsby issues unfairly or inconsistently. Further, there is absolutely no evidence that the Court has applied the rule in a way that could be seen as deliberate avoidance of the federal claim.

Id. at 185.

The petitioner asserts that the Court's treatment of Williams should be different in his case because "the opinion on petitioner's Rule 37 application suggests that the Arkansas Court's focus is not so narrow. The Rule 37 opinion explains the state court's approach toward procedural defaults by citing Wicks v. State, 270 Ark. 781, 606 S.W.2d 366 (1980). Wicks itself sets forth several factors that would influence the Arkansas courts to apply a "plain error" rule excusing procedural defaults: the factors include consideration of the facts of the individual case and the circumstances of the procedural default." Petitioner's Post Hearing Brief at 9–10.

The Court sees very little difference in the treatment afforded Mr. Woodard and Mr. Hulsey by the Arkansas Supreme Court. In both cases, this Court has concluded that the Arkansas Supreme Court decided that the Grigsby issue was not fundamental and was, therefore, barred from review by the procedural default. The court's citation of Wicks does not establish that the Arkansas court is inclined to apply a "plain error" rule as petitioner suggests. Wicks made clear that any "plain error" rule would be applied in only the narrowest of circumstances. In sum, the Arkansas Supreme Court has consistently rejected the Grigsby issue, and has never indicated that it would address the issue at a late stage of the proceedings because it deemed the issue a fundamental one. The petitioner's attempts to establish the contrary amount to little more than semantics.

Mr. Woodard maintains that, regardless of the above, he has established cause and prejudice for his failure to raise the Grigsby claim at trial and appeal. As to the cause prong, the petitioner initially argues that his trial counsel was unaware of the legal basis for the Grigsby claim; that such unawareness was not "reasonable"; and that the Eighth Circuit Court of Appeals has recognized that counsel's lack of knowledge of the law is sufficient cause within the meaning of Wainwright. The petitioner relies on Collins v. Auger, 577 F.2d 1107 (8th Cir.1978), cert. denied, 439 U.S. 1133, 99 S.Ct. 1057, 59 L.Ed.2d 96 (1979). There the court adopted the district court's conclusion that "lack of knowledge of the facts or law would be sufficient cause for failure to make the proper objection." Id. at 1110, n. 2.

Since the parties briefed the issue, the Supreme Court decided Engle v. Isaac, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). In Engle the court stated that:

Every trial presents a myriad of possible claims. Counsel might have overlooked or chosen to omit respondents' due process argument while pursuing other avenues of defense. We have long recognized, however, that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim. Where the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default.

Id. 102 S.Ct. at 1574–75 (footnote omitted).

The Eighth Circuit has since applied Engle to a district court finding that cause was established by counsel's unawareness of a constitutional claim, where that claim was established by case law at the time of trial. Dietz v. Solem, 677 F.2d 672 (8th Cir.1982). The court of appeals held that where "there was then available the basis for a constitutional claim and where other defense coun-

sel had perceived and litigated that claim", no cause existed for the failure to object. *Id.* at 675.

As noted in *Hulsey:*

The Supreme Court in 1968 practically invited persons to raise the issue by specifically leaving the questions open. *Witherspoon v. Illinois,* 391 U.S. 510 [88 S.Ct. 1770, 20 L.Ed.2d 776] (1968). Even if the petitioner could have presented little more evidence at the time of his trial than had been available to the Court in *Witherspoon* the issues could have at least been raised in the trial court. In fact that is precisely what had been done by the trial attorney for Mr. Grigsby in *Grigsby v. Mabry,* 483 F.Supp. 1372 (E.D. Ark.1980), upon which the petitioner relies so heavily in making his claims. The trial in *Grigsby* was in 1975, well in advance of Mr. Hulsey's trial. It simply cannot be said that Mr. Hulsey's trial attorney could not reasonably have been expected to be aware of the issue and the necessity of raising it.

550 F.Supp. at 186. On the basis of *Engle* and *Deitz,* it is clear that Mr. Woodard's claim, as was true with Mr. Hulsey's, was supported at the time of trial (March 1976) by some constitutional basis which had been previously perceived and litigated by defense counsel. In short, the building blocks for such a claim were available. Thus, no cause exists for the lack of a contemporaneous objection.

■ Petitioner also argues that the failure to assert the *Grigsby* claim constituted ineffective assistance of counsel, and that this satisfies the cause prong of *Wainwright. Deitz* and *Engle* only addressed the "unawareness" argument advanced by petitioner, but did not deal with "cause" in the context of an ineffective assistance of counsel argument. While *Engle* makes some reference to attorney competence, and sheds some light on what the Supreme Court would consider ineffective assistance of counsel, it did not deal with that argument in the context of what constitutes "cause" under *Wainwright.* This Court will assume that where counsel's failure to make an objection is due to "unawareness", and the building blocks for that objection existed at the time of trial, the petitioner may establish "cause" by proving that his counsel's ignorance was so egregious that it reached the level of a Sixth Amendment violation. The Court cannot say, however, that Mr. Woodard's trial counsel was constitutionally obligated to raise the issue. While *Witherspoon* invited a *Grigsby* challenge, and while other criminal defense attorneys had raised the issue, the fact remains that not a single court, federal or state, had ruled favorably on a *Grigsby* challenge in 1976. As petitioner acknowledges, the Arkansas Supreme Court continues to reject this claim. Given that circumstance, the Court cannot say that a reasonably competent attorney would have made the *Grigsby* claim in an Arkansas trial court in March 1976. The quotation from *Engle* cited above clearly supports this conclusion. Counsel is not obligated to raise every constitutional claim, particularly where the claim is not supported by substantial precedent. Thus, there was no "cause" for Mr. Woodard's failure to object.

The petitioner's final argument is that the procedural bar of *Wainwright* should not apply in a capital case where the issue raises valid constitutional claims. While review of capital cases must be thorough and exacting, the policy reasons underpinning *Wainwright* apply with equal force in capital cases. As the Court noted in *Hulsey:*

The Court feels compelled to express its views concerning the propriety of the procedural rule it is urged by the petitioner to accept. If the defendant were allowed, with impunity, to withhold an objection to the way the jury is chosen, and raise it for the first time in a plea for collateral relief, an unnecessary burden on the State would be created. It is not unreasonable to require that such issues be raised at a time when the State at least has an opportunity to correct them if accepted as meritorious and thereby avoid the expense and delay of repeated proceeding. The obvious and most efficient vehicle for raising the *Grigsby* is-

sues would be a motion for a pretrial evidentiary hearing. The least desirable from the standpoint of judicial management, the basis for procedural rules, would be to raise the challenges in a collateral attack on the judgment several years after the trial. It is, of course, a matter for state lawmakers to determine what the procedural requirements for raising such issues in its courts shall be. However, absent a clear basis for such a holding, this Court would be reluctant to find that the challenges to the jury which are here in issue could be raised for the first time at such a late date without some showing by the petitioner that the delay should be excused.

550 F.Supp. at 184–5. The Court implicitly recognized in *Hulsey* that these policy reasons apply in capital cases; the *Grigsby* claim only arises when the death penalty is sought. The gravity of the *Grigsby* claim, as it impacts on guilt determination when the death penalty is sought, is most appropriately considered at trial.

Because Mr. Woodard did not raise the *Grigsby* claim at trial, he is precluded from doing so in federal habeas review.

## VII. IMPROPER VOIR DIRE

■ The petitioner argues that his Sixth and Fourteenth Amendment rights to a fair trial were violated by the exclusion of certain veniremen in violation of the Supreme Court's ruling in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). See also, *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). He maintains that the *Witherspoon* rule was violated in two respects. First, he argues that the questions put to the panel of veniremen by the Court were misleading because they assumed that the death penalty was obligatory in some circumstances. The petitioner points to the language of the trial judge when he asked the potential jurors whether they would be able to "return a verdict which carries with it the death penalty." T.Tr. 27. The Court has closely examined the voir dire transcript and concludes that no constitutional error occurred. Placed in context, the trial

judge's remarks were directed only at the jurors' discretionary option to return a sentence of death at the penalty phase of the trial. The following is the complete quotation of the trial judge's question:

Q. If you are accepted as a juror in the trial of this case, Mr. Goad, as juror and under your oath you will have two distinct responsibilities to discharge. First, you, as a juror, must make a decision as to whether or not the defendant, Billy Woodard, is guilty or not guilty of capital felony murder, that is the commission of a murder in the perpetration of a robbery. Secondly, if you find the defendant guilty then it would be your duty under your oath to follow the law of the State of Arkansas and to determine whether or not the proper sentence in this case is one of imprisonment or of death by electrocution at the hands of the State. If you are selected as a juror for the trial of this case can you and will you be able to consider the law of the State of Arkansas providing for the death penalty, consider the death penalty as a proper verdict, and if you feel that is the true verdict return a verdict which carries with it the death penalty?

T.Tr. 26–7.

The Court can discern no violation of the *Witherspoon* rule in the above question. Moreover, the entire transcript reveals that the trial judge repeatedly asked each juror whether they could exercise their, "discretionary judgment...to return a verdict which carries with it the death penalty." T.Tr. 24.

Mr. Woodard also argues that *Witherspoon* was violated because the questions put to the jurors were not precise enough to establish with any certainty the conscientious scruples of the individual veniremen. As his lone example, Mr. Bishop was questioned extensively about his acquaintance with the petitioner's father, a co-worker of Mr. Bishop. The trial court inquired whether Mr. Bishop would be able to return

a verdict of guilty, knowing that he would have to continue to face the petitioner's father in the work environment. Mr. Bishop replied that he would have no difficulty returning a guilty verdict, but that his relationship with the elder Mr. Woodard would make it difficult to return the death penalty. The following coloquy took place:

Q. What I was referring to, Mr. Bishop, in other words, you are working daily with Mr. Woodard. Could you face him and would your friendship be affected or would it worry you or concern you in returning a verdict thinking, well, what am I going to tell Mr. Woodard tomorrow when I see him at work? Would that bother you at all?

JUROR BISHOP: Well, sir, I will put it this way: If it was the death penalty it sure would.

Q. I take it then, Mr. Bishop, from what you say it is your view and your belief that irrespective of what the law of the State of Arkansas provides you could not and would not as a juror consider the death penalty or return a verdict which carries with it the death penalty?

JUROR BISHOP: No, sir.

Q. You just could not and just would not consider that law?

JUROR BISHOP: I just don't believe in it that way.

T.Tr. 57.

Mr. Bishop was then removed for cause. The petitioner points out that Mr. Bishop's negative response to the question of whether he "could not and would not" consider the imposition of the death penalty, actually indicates that he was saying that he could, in fact, vote for the death penalty. The entire context of the voir dire of Mr. Bishop clearly establishes the contrary. No error occurred.

Mr. Woodard also argues that his fair trial rights were violated when the trial court conducted voir dire in the presence of the entire panel, rather than an individual sequestered questioning of each venireman. The petitioner claims that this jeopardized his fair trial rights by making the entire panel more conviction and death prone. He additionally argues that by being exposed to the death qualification process, jurors were influenced to take extreme positions and were therefore excluded on the basis of *Witherspoon* when they ordinarily would not have been. The Court notes that this issue was not pursued at trial or on appeal. It follows from the Court's analysis in Section VI, *supra,* that this issue is waived pursuant to *Wainwright v. Sykes.*

Nor does the Court accept that the failure of counsel to seek individualized voir dire amounted to ineffective assistance of counsel. Given petitioner's failure to produce any legal authority for the position, and particularly given the explicit rejection of this argument by the Supreme Court of Arkansas, the Court concludes that a reasonably competent attorney would not have been obligated to make the argument.

Mr. Woodard also argues that his counsel's failure to re-habilitate certain jurors who were excluded under *Witherspoon* constituted incompetence of counsel. The petitioner makes reference to only two specific jurors. The first of those was Mr. Bishop, discussed *supra.* The petitioner's assertions to the contrary, it is clear to the Court that Mr. Dabney did, in fact, conduct his own specific questioning of Mr. Bishop. No error occurred in Mr. Bishop's exclusion. The only other specific reference to error during voir dire regards juror Knight who noted that he had once supervised Billy Woodard in an employment relationship. The petitioner urges that, had counsel pursued the matter further, he would have discovered that Mr. Knight had actually terminated the petitioner. Mr. Woodard has shown no prejudice resulting from this alleged error. Mr. Knight swore under oath that nothing in his supervision of Mr. Woodard would have any affect whatsoever on his ability to fairly evaluate the evidence and arrive at a just verdict. The Court concludes that the voir dire of petitioner's trial was properly conducted, and that trial counsel was not incompetent in his handling of the voir dire process.

## VIII. THE ARKANSAS DEATH PENALTY STATUTE WAS UNCONSTITUTIONAL AS APPLIED TO THE PETITIONER BECAUSE THE AGGRAVATING CIRCUMSTANCE OF "KILLING FOR PECUNIARY GAIN" WAS OVERBROAD AND ARBITRARY

 Billy Woodard was convicted of capital felony murder under the provisions of the recently enacted Arkansas Criminal Code (effective January 1, 1976). Ark.Stat. Ann. § 41–1501(1)(a) (Repl.1977). That statute provides:

> A person commits capital murder if ... he commits or attempts to commit ... robbery ... and in the course of and in furtherance of the felony, or in immediate flight therefrom, he ... causes the death of any person under circumstances manifesting extreme indifference to the value of human life.

An essential element of the crime is the commission of a robbery. The death must be caused in the course of, or in furtherance of the robbery. Capital murder is punishable by death or life imprisonment without parole. Ark.Stat.Ann. § 41–1501(3) (Repl. 1977).

In determining whether or not to impose the death penalty, the sentencing jury is statutorily limited to consideration of certain aggravating circumstances. One of those circumstances is that "the capital murder was committed for pecuniary gain." Ark.Stat.Ann. § 41–1303(7) (Repl.1977). The Woodard jury concluded that this particular aggravating circumstance existed beyond a reasonable doubt.

Mr. Woodard now argues that "the trial court erred by allowing the jury at the penalty phase of the trial to find a 'pecuniary gain' aggravating circumstance based upon the robbery which the jury had necessarily found in returning the guilty verdict. The trial court should have defined 'pecuniary gain' in a fashion that would have required the jury to find an additional element beyond the elements of robbery." Petitioner's Post Hearing Brief at 71. Mr. Woodard contends that this "double counting" of an element of the offense is uncon-

stitutional because it does not control the discretion of the jury; this particular aggravating circumstance will be present in *all* robbery murders and, the argument goes, there is accordingly no standard for determining when the circumstances should apply.

Mr. Woodard argues that this jury discretion is the very arbitrariness condemned by the Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). This Court disagrees. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) upheld the Georgia death penalty scheme which was enacted after the old provision was invalidated by *Furman.* The new Georgia capital punishment statute limited the jury to a consideration of ten specific aggravating circumstances, among them that the murder was committed for money. The jury in Gregg's case found that this aggravating circumstance existed beyond a reasonable doubt. The petitioner had been convicted of murder for a death caused in the commission of an armed robbery. He was convicted under the Georgia murder statute which provided that "(a) person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." This statute is substantially identical to the old Arkansas murder statute repealed by the adoption of the new criminal code. See, Ark.Stat.Ann. 41–2201 (Repl.1964). The Supreme Court held that the new death penalty statute was not unconstitutionally vague. The specification of aggravating circumstances sufficiently limited the jury's discretion to escape the vice condemned in *Furman.*

> These procedures require the jury to consider the circumstances of the crime and the criminal before it recommends sentence. No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. Instead, the jury's attention is directed to the specific circumstances of the crime: Was it committed for money? ... Are there any spe-

cial facts about this defendant that mitigate against imposing capital punishment (e.g., his youth, the extent of his cooperation with the police, his emotional state at the time of the crime.) As a result, while some jury discretion still exists, "the discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory application." *Coley v. State,* 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974).

428 U.S. at 197–8, 96 S.Ct. at 2936 (footnote omitted).

The Court sees no distinction of any constitutional significance between the Arkansas and Georgia schemes. The only real difference is that Gregg was convicted under the old common law definition of murder, while Woodard was convicted under the modern felony murder statute, which requires the commission of another felony, apart from the murder, as an element of the offense. It would be an anomaly if a different result were required because the Arkansas legislature introduced some specificity and certainty into the elements of the substantive offense. The fact that the jury must find the existence of the robbery in order to convict, and then may consider the motive of robbery as an aggravating circumstance, does not render the jury's discretion unfettered. Rather, the "jury's attention is directed to the specific circumstances of the crime." Id.

Judge Overton rejected a substantially similar challenge to the statute in *Collins v. Lockhart,* 545 F.Supp. 83 (E.D.Ark.1982), *rev'd and remanded on other grounds,* 707 F.2d 341. Petitioner distinguishes Collins by noting that the issue there was whether the "double counting" of the pecuniary gain element amounted to double jeopardy. Judge Overton also noted, however, that the Arkansas Supreme Court has consistently upheld the constitutionality of this particular aggravating circumstance. On the direct appeal of Mr. Woodard's conviction, the Arkansas Supreme Court rejected his contention that the inclusion of this circumstance was not constitutional. The court held, as this court does today, that

Gregg sanctioned the use of such a circumstance in deciding whether or not to impose the death penalty in a case such as Woodard's. 261 Ark. at 905–6, 553 S.W.2d 259.

## IX. THE ARKANSAS DEATH PENALTY STATUTE WAS UNCONSTITUTIONALLY APPLIED TO THE PETITIONER BECAUSE THE AGGRAVATING CIRCUMSTANCE OF "AVOIDING ARREST" WAS INTERPRETED SO THAT IT WAS OVERBROAD AND ARBITRARY

The trial judge instructed the jury on the following aggravating circumstance: "The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." Ark.Stat.Ann. § 41–1303(5) (Repl.1977). The jury found that this circumstance existed beyond a reasonable doubt. The petitioner now argues that the application of this circumstance to his case means that this circumstance can be construed to apply to every felony murder, in that the victim is always a principal witness to the crime. Thus by killing the victim, the defendant has eliminated a witness, and is therefore "avoiding or preventing a lawful arrest." This interpretation has been approved by the Arkansas Supreme Court. *Miller v. State,* 269 Ark. 341, 356, 605 S.W.2d 430 (1980).

Mr. Woodard argues that the above interpretation is unconstitutional because (1) it does not properly control the discretion of the jury; (2) "it can not serve to distinguish between those cases where death is warranted and those where it is not." Petitioner's Post Hearing Brief at 76; and (3) it does not provide adequate notice as required by the due process clause. In addition, the petitioner argues that there was insufficient evidence to support the jury's finding, and that *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) therefore requires this Court to vacate the death penalty.

This provision of the Arkansas Capital Punishment scheme was most recently scrutinized by Judge Woods in *Pickens v. Lockhart,* 542 F.Supp. 585 (E.D.Ark.1982). There the petitioner was convicted of kill-

ing a customer in a grocery store, after the robbery of that store. Eight people were killed in execution-style slayings after the robbery by the petitioner and his accomplices. None of the murders were committed while the felons were actually in the act of fleeing from, or escaping from, police custody. Judge Woods noted that the Arkansas Supreme Court had consistently held that the aggravating circumstance of "preventing a lawful arrest" applied where "a robber... makes the cold-blooded calculation that by annihilating his victim he thereby eradicates an eyewitness to his crime." *Pickens v. State,* 261 Ark. 756, 551 S.W.2d 212, 215 (1977). Judge Woods then stated:

> Petitioner argues that such an interpretation makes this aggravating factor applicable to any felony murder because it can always be said that the elimination of the victim eliminates an eyewitness. I cannot accept such an argument. Here, it appears to me, as it appeared to the Supreme Court of Arkansas, that there was a cold-blooded deliberate attempt to murder all the robbery victims and the rape victim because they had seen and could identify the car in which the robbers and rapists were making their escape.

542 F.Supp. at 585.

The Court need not decide whether this particular aggravating circumstance, as interpreted by the Arkansas Supreme Court, could be applied to every felony murder, and therefore is rendered unconstitutionally vague. Just as Judge Woods concluded in *Pickens,* the individual facts of the case lead the Court to conclude that the circumstance was properly applied. Mr. Woodard's confessions suggest that he thought about robbing Mr. Baker while they were travelling to the scene of the crime. When the car ran out of gas and Mr. Baker turned his back to the petitioner, he confessed to shooting him in the back. The victim then fell to the ground, moaning. The jury could certainly have concluded that, at that point, Mr. Baker was sufficiently incapacitated to offer no resistance to the robbery. But the petitioner admitted shooting the victim two additional times at close range,

before taking the money and fleeing the scene. On those facts, the jury could properly find that the victim was killed to prevent any identification of the assailant. An execution-style slaying, where the victim is also robbed, suggests that the defendant committed the capital felony "for the purpose of... preventing a lawful arrest." The jury's discretion was properly directed to the circumstances of the crime, and there was sufficient evidence from which a jury could find that this aggravating factor existed.

## X. THE VERDICT FORM PROVIDED TO THE JURY AT THE PENALTY PHASE IMPERMISSIBLY CONSTRAINED THE JURY'S CONSIDERATION OF MITIGATING CIRCUMSTANCES

The petitioner argues that the verdict form, the "checklist", submitted to the jury at the penalty phase was flawed because: (1) it misled the jury into believing that they could impose the death penalty if the mitigating circumstances equalled the aggravating circumstances; and (2) it misled the jury into believing that they had to unanimously agree on a *particular* mitigating circumstance, rather than unanimously agree that *some* mitigating circumstances existed.

At the penalty phase the jury was provided with a three part verdict form. The first part, entitled "Form A", dealt with aggravating circumstances. That form listed the five statutory aggravating circumstances, and provided a place for the jury to check whether that circumstance did or did not apply. For those places where the jury could check that the circumstance did apply, the statement made clear that the jury had to so find beyond a reasonable doubt. The jury found two aggravating circumstances: that the felony was "committed for the purpose of avoiding or preventing a lawful arrest," and that it was "committed for pecuniary gain." "Form B" dealt with mitigating circumstances. That form instructed the jury to place a check mark in the appropriate space next to the sentence in

accordance with the Jury's findings. The form instructed that, "your findings must be unanimous." There followed a list of five mitigating circumstances (unusual pressure or influence; mental disease or defect; age; defendant was an accomplice; extreme mental or emotional disturbance). There was an additional category for the jury to check whether "additional mitigating circumstances" did or did not exist. Form C was entitled "Conclusions and Verdict". The initial portion asked the jury to check whether one or more aggravating circumstances existed. If the answer was no, then the jury was instructed to check the box for life imprisonment without parole. The second box asked the jury to check whether one or more mitigating circumstances existed. The third section asked the jury to check whether the mitigating circumstances were or were not sufficient to outweigh the aggravating circumstances. The jury checked the box which said that the mitigating did not outweigh the aggravating circumstances. The final portion of the form inquired whether the aggravating circumstances were or were not sufficient to justify the imposition of the death sentence. The jury checked the box which said that the aggravating circumstances were sufficient, and then checked the box for the death sentence. At the beginning of Form C, the jury was instructed that their findings had to be unanimous.

Mr. Woodard argues that the third portion of Form C was in error because it posed the questions whether the mitigating circumstances were sufficient to outweigh the aggravating ones. The implication from this, the petitioner argues, is that the jury could decide to impose death if it believed that the mitigating circumstances equalled the aggravating ones, for in that instance the mitigating circumstances would technically not "outweigh" the aggravating ones. The Court rejects this argument for three reasons: (a) no objection was made at trial, nor was the argument pressed on appeal; (b) the trial judge correctly instructed the jury in his oral instructions when he told them that they could

"not return a verdict imposing the sentence of death unless you make written findings and conclusions... that beyond a reasonable doubt no mitigating circumstance or circumstances which you may find to exist outweighs or equals in weight the aggravated circumstance or circumstances." T.Tr. 752; and (c) the jury found that no mitigating circumstances existed, thereby rendering petitioner's argument moot.

The petitioner also argues that the jury could not properly consider factors in mitigation because the checklist form suggested that the jury must unanimously find that a particular factor existed. Thus, he argues that "as guided by the checklist form, the jurors were only able to apply a mitigating circumstance against the death penalty if they unanimously agreed on what that circumstance was. If, however, the jurors all agreed that there were several mitigating circumstances, but were not unanimous as to which particular circumstance applied, no mitigating circumstances could be considered, according to the form." Petitioner's Post Hearing Brief at 82. This restriction on the jury's discretion to find factors in mitigation is unconstitutional, according to the petitioner, by virtue of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Those cases stand for the proposition that the jury must be permitted to consider any and all possible factors in mitigation of the penalty of death. Of course, neither *Lockett* or *Eddings* specifically holds that unanimity is not required for each specific mitigating circumstance. The Court will assume for the purposes of this argument, however, that unanimity on each specific mitigating factor is not required. That problem is alleviated in this case, however, by requiring the jury to reach a unanimous finding not only that a particular mitigating circumstance did exist, but also a unanimous finding that the factor did *not* exist. For example, the jury was asked to check the box opposite one of the following statements:

The defendant's age, at the time of the commission of the felony capital murder, was a mitigating circumstance

or

The defendant's age, at the time of the commission of the capital felony murder, was not a mitigating circumstance.

The Court notes that the negative option was checked with respect to each mitigating circumstance. At the end of Form B, the jury was asked to choose between similar options for whether "additional mitigating circumstances not mentioned above do (or do not) exist." The jury found that none of the listed mitigating circumstances existed, and also found that no additional mitigating circumstances existed. Thus, if one accepts Mr. Woodard's argument that unanimity was required (by the verdict form) for the jury to find that a particular factor in mitigation existed, then it follows that the jury, by check marking the negative option, was required to unanimously find that the circumstance did *not* exist.

While the Court does not feel that the verdict form was a model of clarity, or thoroughly explained the law, the petitioner's argument that the verdict form precluded a consideration of all mitigating factors did not, in fact, occur in this case. The Court must assume that the jury unanimously found that the particular mitigating factors did not exist. A more difficult question arises, of course, regarding what the proper procedures would be if the jury was in fact split on the question of whether a particular circumstance did or did not exist. In that event, given the assumed requirement of unanimity, one must assume that they would be unable to check either box. In that event, one must assume that the jury would report they were deadlocked, or ask the Court for further instruction as to how to proceed. In any event, the Court must conclude that no deadlock occurred here, and the jury unanimously concluded that no factors in mitigation existed.

The only communication that the jury had with the trial court is reflected at T.Tr. 771–2. The penalty question was submitted to the jury at 2:10 p.m., and they returned to open court at 3:39 p.m. The jury foreman told the court that they had a question. He said that they had answered all of Form A, Form B, and section I of Form C. That is, the jury had answered the questions relating to the aggravating circumstances, the mitigating circumstances, whether the aggravating outweighed the mitigating, and whether the aggravating were sufficient to justify imposition of the death penalty. The only remaining portion was Section II of Form C, which stated that: "We the jury, after careful deliberation, have determined that the defendant shall be sentenced to: A. ( ) Life imprisonment without parole; or B. ( ) Death by electrocution." When the court inquired of the jury foreman what the question was, he made the following statement:

Your Honor, the way that we have answered Forms A and B, section one, we have come down to section two where according to the law we have only one place to mark and we can't agree upon that now.

The court inquired how the jury was divided numerically, and, when informed that they were split seven to five, instructed the jury to go back and deliberate further. The court stated:

I am going to require you to retire and deliberate and see if you cannot reconcile your differences by further deliberations and discussion among yourselves permitting everyone to be heard, to express their views and their opinions. Those opinions should prevail which appear most reasonable, logical and sound.

The jury retired again at 3:43 p.m. and returned at 3:56 p.m. with a sentence of death.

From this colloquy between the court and the jury foreman, the Court arrives at the following conclusions: (1) the jury had, at that point, answered the questions on Form A, Form B, and Form C, section I, just as they appeared when the final sentence was handed down; (2) the jury was confused as to whether their findings required them to impose the death penalty, or whether that

matter was still up to their judgment; and (3) the court instructed them that they should continue to deliberate, and implicitly recognized that the jury had the option to vote against the death penalty, regardless of their answers to the previous questions. Thus, when deadlocked on a particular question, the jury asked the court for guidance. And, while the court was not as specific on the law on this question as it might have been, no constitutional error occurred.

## XI. THE PETITIONER'S RIGHT TO A FAIR TRIAL WAS VIOLATED WHEN THE TRIAL COURT FAILED TO EXCUSE A BIASED JUROR FOR CAUSE

■ The trial court refused to excuse a venireman for cause who was the brother-in-law of Poinsett County Sheriff Crawford. The venireman, Mr. Bonham, stated at one point on voir dire examination that he would "possibly" give a police officer's testimony more credence than that of an ordinary citizen. Petitioner's trial counsel was forced to use a peremptory challenge to strike Mr. Bonham.

This was not the petitioner's final peremptory challenge, nor did it eventually result in a depletion of his peremptory strikes. When the jury was finally selected, Mr. Woodard had peremptory challenges remaining. Given that circumstance, the Court sees no prejudice in the court's refusal to strike Mr. Bonham for cause, assuming for purposes of argument that said refusal was indeed error. Arkansas law requires exhaustion of peremptory challenges, i.e., actual prejudice, before a refusal to excuse a juror for cause is reversible error. *Arkansas Highway Commission v. Dalrymple,* 252 Ark. 771, 480 S.W.2d 955 (1972); *Kirk v. State,* 270 Ark. 983, 986, 606 S.W.2d 755 (1980).

## XII. THE PETITIONER'S RIGHT TO A FAIR TRIAL WAS VIOLATED BECAUSE OF PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENTS

■ The Petitioner claims that three separate statements by the prosecutors during closing arguments, to which no objections were made at trial, so prejudiced his rights to a fair trial that his conviction should be vacated.

The first statement, made during the guilt phase summations, was to the effect that accepting the petitioner's testimony, and thereby disbelieving his confessions, would be tantamount to a conviction of the police officers involved. The second statement, made during penalty phase closing arguments, implied that the death penalty was appropriate because the prosecution had made the decision to seek it. The final statement was that the police did not know about the existence of the victim's shoes or wallet, until Mr. Woodard confessed to throwing them in the drainage ditch. In fact, a search of the drainage ditch never turned up the shoes or the wallet. The fact was brought out in the evidence at trial. Lt. Odom testified that the current in the ditch was too swift for any items to have remained there for long.

As noted, these alleged improprieties of the prosecutor were not objected to at trial, nor were they pursued on direct appeal. Accordingly, the Court concludes that the petitioner has waived these claims pursuant to *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1978). On the basis of legal principles expressed elsewhere in this opinion, the Court also concludes that Mr. Dabney's failure to object did not amount to ineffective assistance of counsel, and did not, therefore, amount to "cause" within the meaning of *Wainwright.* Trial counsel was not ignoring the introduction of crucial, damning evidence, but only the off-hand remarks of the prosecutor. The decision whether or not to object to opposing counsel's argument often rests on subtle tactical judgments. The Court cannot second guess those tactical decisions on federal habeas review.

## XIII. THE PETITIONER'S FIFTH AMENDMENT RIGHTS WERE VIOLATED BY THE INTRODUCTION OF INVOLUNTARY CONFESSIONS

■ Mr. Woodard urges this Court to reject the trial court's finding following the *Denno* hearing, that the confessions were voluntary. The trial court's factual find-

ings are presumptively correct. 28 U.S.C. § 2254(d). The Court has carefully reviewed the evidence presented. There was ample evidence to support the trial court's finding of voluntariness, and that factual finding will not be reversed on federal habeas review.

## XIV. PETITIONER'S FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE TESTIMONY OF THE NEWSPAPER REPORTER WHO TESTIFIED ABOUT STATEMENTS MADE BY THE PETITIONER ON OCTOBER 11

As previously mentioned, a newspaper reporter testified that, on October 11 he accompanied Mr. Woodard and the police to the drainage ditch into which the petitioner stated that he threw the shoes and wallet of the victim. He testified that he learned of this "interrogation" from a "confidential source". The petitioner allegedly told the reporter about throwing the items into the drainage ditch and about contemplating what he had done after committing the murder. The reporter further testified that he observed Mr. Woodard sitting alone by himself, stating: "What have I done?"

Mr. Woodard argues that he was not advised of his *Miranda* warnings prior to speaking to the reporter, and that the statements he made are, therefore, inadmissible. This argument is based on *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), where the Supreme Court held that statements made to a court appointed psychiatrist were inadmissible because of the absence of *Miranda* warnings. The court concluded that, because the psychiatrist was court appointed, statements taken by him were taken on behalf of the state. Mr. Woodard argues that because the reporter learned of the trip to the drainage ditch from a "confidential source", there was evidence that he was told by the police about it and was, therefore, encouraged to elicit statements from Woodard. He argues that the reporter was the "tacit agent" of the state.

While trial counsel objected to the testimony of the reporter, no objection was made on the *Miranda* grounds asserted here. The issue was not pursued on appeal. The Court, therefore, concludes that this issue is barred from review by the rule in *Wainwright v. Sykes,* discussed *supra.* The Court also rejects the argument that counsel's failure to assert this issue amounted to ineffective assistance of counsel. First of all, the application of *Estelle* to these facts is simply not permitted by the evidence. The reporter did not have the sanction of the court as did the psychiatrist in *Estelle,* and only the sketchiest facts suggest that the reporter was a "tacit agent" of the state. Furthermore, this trial occurred some five years before *Estelle* was decided, and the Court cannot say that a reasonably competent trial attorney would have known to make the argument at that time.

## XV. PETITIONER'S RIGHT TO A FAIR TRIAL WAS VIOLATED BY A ONE WEEK DELAY IN THE TRIAL

Mr. Woodard argues that his trial was prejudiced by a one week recess between the close of the defendant's case and the instructions and closing arguments. The trial was recessed due to the illness of a juror. This argument was not raised at trial or on appeal, and is, therefore, barred from review by *Wainwright.* The Court does not accept the argument that the failure of trial counsel to seek a voir dire of the jury after the recess constituted ineffective assistance of counsel. Mr. Woodard has not offered any evidence or argument that he was at all prejudiced by the week long delay.

## XVI. THE DEATH PENALTY WAS DISCRIMINATORILY APPLIED BECAUSE THE VICTIM WAS WHITE

Mr. Woodard argues that the imposition of the death penalty was arbitrary because it is more harshly imposed when the victim of the murder is white. Both Mr. Baker and Mr. Woodard are white. This argument is, of course, usually asserted when the victim is white and the defendant is black. In any event, the Court can

find no evidence that the death penalty was arbitrarily imposed because of the victim's race. As the preceding analysis makes clear, the death penalty was appropriately imposed because of the particularly heinous nature of the circumstances of the crime.

## XVII. THE LACK OF COMPARATIVE APPELLATE REVIEW

 The petitioner argues that his death sentence should be vacated because the Arkansas Supreme Court conducted no proportionality review; i.e., the court did not compare his case with those in which the death sentence was imposed under the Arkansas death penalty statute. The Ninth Circuit has recently held that such a comparative review is constitutionally required. The Supreme Court has granted certiorari to consider that question. *Harris v. Pulley,* 692 F.2d 1189, 1196–97 (9th Cir.1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 1425, 75 L.Ed.2d 787 (1983).

The Eighth Circuit has recently reversed a district court's denial of a habeas corpus petition, and remanded the case with instructions to retain jurisdiction of the case until such time as the petitioner presented his case for comparative review to the Arkansas Supreme Court. The court of appeals noted that, although the state supreme court has expressly held that such a review is not constitutionally required, they have since vacated several death sentences because the punishment was disproportionate to similar cases. The court concluded that, because the supreme court of this state had "left open the door to successive Rule 37 petitions", the interest of comity required the petitioner to once again petition the state courts for a proportionality review. *Collins v. Lockhart,* 707 F.2d 341 (8th Cir.1983).

Since the Eighth Circuit's decision in *Collins,* Judge Overton has ordered the petitioner in that case to seek such a review with the Arkansas Supreme Court. Judge Overton also entered an order in another death penalty habeas petition pending before him, *Ruiz and Denton v. Lockhart,*

PB–C–82–376, directing the petitioners to seek additional Rule 37 relief for a comparative review of their sentences.

The Arkansas Supreme Court has since ruled on the application for a Rule 37 comparative review filed by Ruiz and Denton, *Ruiz and Denton v. State,* 280 Ark. 190, 655 S.W.2d 441 (Ark.1983). The court first noted that it "will not entertain a subsequent petition under Rule 37 unless the original petition was specifically denied without prejudice to filing a second petition. *Williams v. State,* 273 Ark. 315, 619 S.W.2d 628 (1981). Since petitioners' original petition was denied with prejudice, they are not entitled to a second petition even though theirs is a capital case". Per Curiam Opinion at ——. The Court then noted that, "(a)lthough the words 'comparative review' may not appear in our opinion, such a review has been afforded in every capital case since the practice was made a part of our appellate review process." *Id.* at —— – ——. Judge Hickman concurred, noting that:

> This court has not approved the death penalty in a single case where the appellant or appellants did not deserve the ultimate legal penalty for the conduct for which they were found guilty. We have not mentioned in every opinion that we compared the death penalty with cases with similar facts to meet the requirement of comparative review, and perhaps we should have. But, quite frankly, it has never occurred to us when we have approved the death penalty that the appellant did not deserve the sentence that the jury imposed. Concurrence at 1.

Judge Hickman then listed all of those cases in which the court had sanctioned the imposition of the death penalty. Among them was Billy Woodard's case. See, Addendum to Concurrence at 1.

In light of the Arkansas Supreme Court's treatment of the Ruiz and Denton petitions, the Court concludes that nothing is to be gained by a remand of this case back to that court. Not only has Mr. Woodard al-

ready presented his Rule 37 petition and had it denied with prejudice, but the court made it clear that they did, in fact, conduct a proportionality review of his sentence.

### CONCLUSION

On the basis of all of the foregoing, it is clear to the Court that the petitioner is entitled to none of the relief he seeks. The conviction and sentence were imposed in accordance with the standards of the Constitution.

IT IS THEREFORE ORDERED that the petition for a writ of habeas corpus be, and it is hereby, denied.